**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEAGUE OF WILDERNESS
DEFENDERS/BLUE MOUNTAINS
BIODIVERSITY PROJECT, an Oregon
nonprofit corporation; HELLS
CANYON PRESERVATION COUNCIL,
an Oregon nonprofit corporation,
          *Plaintiffs-Appellants*,

v.

KENT CONNAUGHTON, Regional
Forester, Pacific Northwest Region
of the Forest Service, in his official
capacity; UNITED STATES FOREST
SERVICE, an agency of the United
States Department of Agriculture;
U.S. FISH & WILDLIFE SERVICE, an
agency of the United States
Department of the Interior; GARY
MILLER, Field Supervisor, United
States Fish and Wildlife Service, in
his official capacity,
          *Defendants-Appellees*,

BAKER COUNTY, a political
subdivision of the State of Oregon;
UNION COUNTY, a political
subdivision of the State of Oregon;
BOISE CASCADE WOOD PRODUCTS, a

No. 13-35653

D.C. No.
3:12-cv-02271-
HZ

OPINION

Delaware limited liability company;
AMERICAN FOREST RESOURCE
COUNCIL, an Oregon nonprofit
corporation; CHARY MIRES, an
individual; OREGON SMALL
WOODLANDS ASSOCIATION, an
Oregon nonprofit corporation,
*Intervenor-Defendants–Appellees.*

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted
February 5, 2014—Seattle, Washington

Filed May 8, 2014

Before: Raymond C. Fisher, Ronald M. Gould,
and Morgan Christen, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Environmental Law / Preliminary Injunction

The panel affirmed in part and reversed in part the district court's denial of a motion to preliminarily enjoin the Snow Basin logging project in Oregon, and remanded for entry of a preliminary injunction, the scope of which the district court should determine on remand.

The panel held that the plaintiffs had shown that they are likely to prevail on their National Environmental Policy Act ("NEPA") claim regarding the final Environmental Impact Statement's discussion of elk habitat because that discussion was insufficiently clear, and therefore the analysis of the project's effects on elk failed to satisfy NEPA requirements. The panel also held that the plaintiffs had shown that absent a preliminary injunction, they were likely to face irreparable harm. The panel further held that the plaintiffs had shown that the balance of equities tipped in their favor, and that the public interest supported the granting of a preliminary injunction. The panel reversed the district court on this claim, but affirmed the district court's determination that the plaintiffs were not likely to succeed on their remaining claims.

The panel remanded with instructions for the district court to enter a preliminary injunction sufficient to protect the status quo while the United States Forest Service completed a supplemental environmental impact statement.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Thomas Buchele (argued), Earthrise Law Center, Portland, Oregon, for Plaintiff-Appellant League of Wilderness Defenders/Blue Mountain Preservation Project and Jennifer Schemm, La Grande, Oregon, for Plaintiff-Appellant Hells Canyon Preservation Council.

J. David Gunter II (argued), Robert G. Dreher, and Beverly F. Li, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

Caroline Lobdell (argued), Western Resources Legal Center, Portland, Oregon, and Scott W. Horngren, American Forest Resource Council, Portland, Oregon, for Defendant-Intervenors–Appellees.

## OPINION

GOULD, Circuit Judge:

The League of Wilderness Defenders/Blue Mountain Biodiversity Project and the Hells Canyon Preservation Council (collectively "the LOWD plaintiffs") appeal from the district court's denial of their motion to preliminarily enjoin the Snow Basin logging project. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We affirm in part and reverse in part the district court's order, and remand the case to the district court for the entry of a preliminary injunction, the scope of which the district court should determine on remand.

**I**

The Snow Basin project area encompasses nearly 29,000 acres of the Whitman-Wallowa National Forest ("the Forest") in northeast Oregon, and the United States Forest Service ("USFS") has been planning a logging project in this area since 2008. A draft environmental impact statement ("EIS") was issued in March 2011, and the final EIS ("FEIS") was issued in March 2012. One way in which the FEIS differed from the draft EIS is that one segment of the project, about 170 acres of regenerative logging, had been removed from consideration in the FEIS. After the adoption of the FEIS, in April 2012, the Forest Supervisor withdrew the Forest's Travel Management Plan ("TMP"), which had proposed to regulate off-road motorized travel and reduce the amount of roads within the Forest, and which had been mentioned in addressing environmental harms from the logging project. In July 2012, the USFS issued a correction notice that said that "group selection" treatment was being considered for 130 of the 170 acres that had been removed from the draft EIS and not considered in the FEIS.

The LOWD plaintiffs filed suit seeking to enjoin the timber sale on the grounds that the USFS and the United States Fish & Wildlife Service ("USFWS") had violated the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"). The district court held that the LOWD plaintiffs were not likely to succeed on any of their claims, and that the balance of harms did not tip sharply in the LOWD plaintiffs' favor. The district court therefore denied the preliminary injunction. The LOWD plaintiffs filed a timely notice of appeal.

## II

We review a district court's denial of a preliminary injunction for abuse of discretion. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013). An abuse of discretion occurs when the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). Because all claims raised in this appeal relate to whether the district court's view of the law was erroneous, our review of this decision of the district court is de novo. *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012).

A motion for a preliminary injunction requires that a plaintiff show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[1]

The LOWD plaintiffs' substantive NEPA and ESA claims are reviewed under the Administrative Procedure Act, which allows courts to set aside agency actions that are "arbitrary,

---

[1] In supplementation, we have said that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). In our analysis we do not rely on this supplemental rule because we determine that there is a likelihood of success on the merits on one claim.

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Factual determinations must be supported by substantial evidence. *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). The arbitrary and capricious standard requires "a rational connection between facts found and conclusions made." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

## III

We first analyze whether the LOWD plaintiffs are likely to succeed on the merits of any of their claims under prong one of *Winter*. Upon determining that they are, we then proceed to consider the remaining prongs of the *Winter* test to determine whether the LOWD plaintiffs face irreparable injury, to balance the equities between the parties, and to examine the public interest to determine whether a preliminary injunction is warranted. *Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

## A

The LOWD plaintiffs raise four challenges to the Snow Basin FEIS under NEPA, and an additional challenge under the ESA. Under NEPA, they argue that 1) now that the TMP has been withdrawn, the FEIS' reliance on the TMP in analyzing the impact of the project on certain species within the Forest is invalid, and a supplemental EIS must be completed; 2) the FEIS' failure to consider the cumulative effects of the 130-acre logging project in the correction notice was error; 3) the failure of the FEIS to analyze the cumulative effects of potentially increased stream temperatures and sedimentation was error; and 4) the FEIS did not properly

explain why it found that bull trout were not present in the project area, and so did not analyze the project's impact on bull trout. Under the ESA, the LOWD plaintiffs challenge the USFS' and USFWS' joint determination that bull trout, a threatened species, were not present in the project area. Each of these challenges is addressed separately below.

**1**

NEPA requires agencies to prepare a supplemental EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). When determining whether to issue a supplemental EIS, an agency must "apply a rule of reason," not supplementing "every time new information comes to light" but continuing to maintain a "hard look" at the impact of agency action when the "new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 373–74 (1989) (internal quotation marks and alteration omitted). In *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549 (9th Cir. 2006), we required the Bureau of Land Management to prepare a supplemental EIS after it changed a policy upon which the original EIS had relied. *Id.* at 561–62. We noted that the bar for whether "significant effects" may occur is "a low standard." *Id.* at 562. That the policy change "raise[d] 'substantial questions' regarding [the project's] impact" was enough to require further analysis before allowing the project to proceed. *Id.* at 562.

The Snow Basin FEIS opens its analysis of the project's impact on the area's elk population by stating that elk are the "most popular" big game in the area, and are "an indicator of the quality and diversity of the general forested habitat," but that "[d]isturbance due to roads is a major factor influencing elk distribution." After surveying the existing status of the habitat, it begins its analysis of road density. It notes that three parcels within the project area currently exceed the recommended road density, but that the TMP, "will result in a net reduction of open roads within the project area, which will provide additional habitat that is free from disturbance from motor vehicles." It then goes on to say that, although the precise reduction in road density could not be quantified because the TMP was not final, the TMP would "result in a substantial improvement in elk security habitat in the Snow Basin project area." It also includes a table, which calculates the road density in all affected parcels under each alternative. At oral argument, counsel for the USFS explained that this chart does not include the impact of the TMP within its calculations. Later, under separate header, the FEIS discusses the potential impacts of other foreseeable future projects, including fire thinning, cattle grazing, and the TMP.

The LOWD plaintiffs have shown it likely that they will prevail on their claim that with the TMP now withdrawn, the USFS must prepare a supplemental EIS.[2] Although parts of the USFS' analysis do not consider the TMP, as a whole, its

---

[2] Our conclusion that a supplemental EIS must look at environmental impacts without the TMP applies only to assessment of impact on elk. The LOWD plaintiffs make similar claims regarding the FEIS' analysis of the project's impact on other species and habitats, but we conclude the analysis of the environmental impacts on other species would not be significantly impacted by presence or absence of the TMP.

review of the Snow Basin project's independent environmental impacts on elk and their habitat are interwoven with statements that explicitly rely upon the TMP to mitigate harms that the Snow Basin project will cause. When the public reviews an EIS to assess the environmental harms a project will cause and weighs them against the benefits of that project, the public should not be required to parse the agency's statements to determine how an area will be impacted, and particularly to determine which portions of the agency's analysis rely on accurate and up-to-date information, and which portions are no longer relevant. Here, statements that the TMP will mitigate harms are interspersed with analysis that properly looks only at the Snow Basin project itself.

This lack of clarity likely renders the EIS deficient. Informed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA. *See, e.g.*, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (describing one of the purposes of NEPA as ensuring "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006) (noting that one of the purposes of NEPA is "ensuring that the public can both contribute to that body of information, and can access the information that is made public"). Without supplemental analysis of impacts absent the TMP, previously stressed in parts of the agency's assessment, the public would be at risk of proceeding on mistaken assumptions. We conclude that the LOWD plaintiffs are likely to prevail on their claim that a

supplemental EIS must be completed to show the environmental impact of the Snow Basin project on elk and their habitat now that the TMP has been withdrawn.

**2**

NEPA's implementing regulations require that when agencies prepare an EIS, that document must consider the cumulative impacts of the action under consideration, and defines cumulative impacts as "the incremental impact[s] of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. A reasonably foreseeable future action is defined as an "[i]dentified proposal[]," 36 C.F.R. § 220.3, and an identified proposal exists where the agency "has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 36 C.F.R. § 220.4(a)(1). Although "projects need not be finalized before they are reasonably foreseeable," *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011), they must be more than merely "contemplated," *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976). When looking at whether a potential future action is an identified proposal, courts must "focus upon a proposal's parameters as the agency defines them." *California. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

The LOWD plaintiffs have not shown that they are likely to prevail on their claim that the 130 acres of group selection treatment listed in the USFS' Correction Notice meet the standard for an identified proposal for which cumulative impacts analysis must be done. The USFS may have a goal, but the likelihood of proceeding on that goal and a timetable

on any such action are not yet defined. More importantly, there is no indication that the USFS "is actively preparing to make a decision," 36 C.F.R. § 220.4(a)(1), but rather, they have disclaimed any intention to move forward on that logging in any particular time frame. As the record now stands, the USFS may permit this logging, or it may not take any action at all. Environmental impacts of this possibility are at present inchoate and to a degree speculative. If the USFS proceeds, the agency will then be required to complete an independent EIS, but we affirm the district court's holding that the LOWD plaintiffs are not likely to succeed on the merits of their claim that the potential group selection treatment must be considered among the cumulative effects in the Snow Basin EIS.

**3**

In the LOWD plaintiffs' second cumulative effects claim, they argue that the FEIS did not consider the symbiotic relationship between increased sediment in the streams that flow through the project area and the pre-existing thermal stress that the stream's high temperatures place on the fish that inhabit the streams. The EIS notes that both Little Eagle Creek and Eagle Creek exceed their target temperatures, which results in harms for both migration and spawning. It also notes that logging could add low to moderate amounts of sediment to those same streams. However, the LOWD plaintiffs' allegation misapplies the cumulative impact test. Because the project will not have any impact on stream temperatures, any thermal stress on the fish is a part of the project's environmental baseline. Therefore, no cumulative effects analysis is required, and the LOWD plaintiffs have not shown that they are likely to prevail on this claim.

**4**

Federal agencies must undertake a "full and fair" analysis of the environmental impacts of their activities. 40 C.F.R. § 1502.1. This is a crucial cornerstone of NEPA. "NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action . . . [and] inform the public that it has indeed considered environmental concerns in its decisionmaking process.'" *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (alteration in original) (citation omitted). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Id*.

In the FEIS, the USFS cited to a study of the project area by the Oregon Department of Fish and Wildlife. The Oregon study indicates that, although bull trout were "common" in Eagle Creek in the 1940s and '50s and continued to be documented there through the 1980s, snorkeling surveys conducted between 1991 and 1994 failed to find bull trout in Eagle Creek. The EIS concludes that "[b]ull trout have likely been extirpated from the Eagle Creek system since the 1990s," and as a result, the EIS does not analyze the impact of the Snow Basin project on bull trout. While the FEIS does not engage with existing contrary scientific opinions about the potential presence of bull trout in Eagle Creek, it included all of the relevant scientific data and contains sufficient information to let the public make an informed determination of the environmental impacts of the Snow Basin project.

The LOWD plaintiffs argue that the data relied upon by the USFS are too vague or stale to support the conclusions drawn from it. In some contexts, NEPA's "hard look"

standard requires agencies to conduct new scientific studies in order to "full[y] and fair[ly]" analyze the impacts of a particular project. *See, e.g., N. Plains*, 668 F.3d at 1085–87 (overturning reliance on 10-year-old aerial survey data); *Lands Council v. Powell*, 395 F.3d 1019, 1030–31 (9th Cir. 2005) (holding that reliance on 13-year-old habitat studies was arbitrary and capricious). The snorkel surveys were aged – more than 15 years old by the time the Final EIS was released. Nevertheless, there was no reliable evidence that showed their results were likely incorrect or that the status of bull trout in the project area had changed over time, so we cannot say that the USFWS and USFS' reliance on the surveys was arbitrary and capricious. The LOWD plaintiffs have not shown that they are likely to prevail on this claim.

**5**

The ESA requires that agencies "insure that any [agency] action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). To accomplish this, agencies must ask the USFWS if any endangered or threatened species "may be present" in the area of a proposed action, and the USFWS is to determine the answer using "the best scientific and commercial data available." 16 U.S.C. § 1536(c)(1). In making this determination, the USFWS must "give the benefit of the doubt to the species." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (quoting H.R. Conf. Rep. No. 96-697, 96th Cong., 1st Sess. at 12) (internal quotation marks omitted). The LOWD plaintiffs advocate two key issues with the conclusion that bull trout are not present in Eagle Creek: The first is that the data relied upon by the USFS and USFWS are too vague or stale to support

the conclusions drawn from it. The second is that the USFS and USFWS arbitrarily ignored the contrary conclusions derived from that data in other reports.

The ESA's requirement that agencies use "the best scientific and commercial data available," 16 U.S.C. § 1536(c)(1), means that agencies must support their conclusions with accurate and reliable data. However, so long as an agency considers all relevant data, it may rely on that available evidence even when it is imperfect, weak, and not necessarily dispositive. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336–37 (9th Cir. 1992). Because of the age of the snorkel surveys (see Part III.A.4, *infra*), the evidence of the bull trout's absence was relatively weak. Nevertheless, for the same reasons that we found that reliance on the surveys was not a violation of NEPA, we conclude that the evidence was sufficiently strong to meet the agencies' burden under the ESA.

The LOWD plaintiffs argue that the USFS and USFWS arbitrarily ignored the contrary conclusions derived from the same data in other reports. That fisheries experts in other agencies read the same studies and thought it unclear whether bull trout were present in Eagle Creek does not make the USFS and USFWS' determination to the contrary arbitrary or capricious. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658-59 (9th Cir. 2009) ("We grant considerable discretion to agencies on matters requiring a high level of technical expertise. Though a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not our role to weigh competing scientific analyses.") (internal quotation marks and citation omitted). While it is true that contrary scientific explanations can serve as evidence of arbitrary and capricious agency decision-making,

*see Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009), we conclude that is not the case here, where the scientific studies were ambiguous and the analyses of the agencies were supported by a reasonable reading of the evidence.

The determination by both the USFWS and USFS that bull trout were "likely extirpated" from Eagle Creek was not arbitrary and capricious. The LOWD plaintiffs are not likely to succeed on the merits of this claim.

**B**

The USFS concedes that the LOWD plaintiffs' harms are irreparable, but defendants-intervenors-appellees Baker County, Union County, Boise Cascade, the American Resource Council, Chary Mires, and the Oregon Small Woodlands Association disagree. While intervenors properly note that it would be incorrect to hold that all potential environmental injury warrants an injunction, this objection is more aptly aimed at the remaining prongs of the *Winter* analysis. "[T]he Supreme Court has instructed us that [e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc), quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (internal quotation marks omitted), *abrogated in part on other grounds by Winter*, 555 U.S. at 20. The LOWD plaintiffs have shown that the Snow Basin project will lead to the logging of thousands of mature trees. The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally

remedy such damage.  The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis.

Intervenors argue that because the project area has previously been logged,  the project does not contemplate logging old-growth forest, and there were only limited or delayed objections by the LOWD plaintiffs to the logging plan, these circumstances mitigate the irreparability of this harm.  But none of these contentions are supported by our precedent.  We have upheld or granted injunctions in cases involving only smaller trees and in areas that have previously been logged, *see Wild Rockies*, 632 F.3d at 1129, 1135, and in cases where plaintiffs have been less than timely, *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381–82 (9th Cir. 1998).  We have never made a rule that a plaintiff must challenge all related harms  to maintain an ability to challenge the harm that it views as the most serious.  Like the plaintiffs in *Wild Rockies*, the LOWD plaintiffs have shown that the Snow Basin project is likely to irreparably harm their members' interest in the project area, and we now must consider the third and fourth *Winter* prongs.

## C

Balancing the equities in this case requires comparison between the irreparable environmental harms pled by the LOWD plaintiffs, on the one hand, and the economic interests of the intervenors, on the other hand.  The USFS does not raise any equitable interests specific to itself, limiting its argument to the public interest.  Both the economic and environmental interests are relevant factors, and both carry weight in this analysis.  *See, e.g.*, *McNair*, 537 F.3d at 1004–05 (considering both economic losses and irreparable

environmental harm). However, we conclude that the balance of equities tips toward the LOWD plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay.[3] *See Amoco*, 480 U.S. at 545 ("If such [irreparable environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction.").

Intervenors raise two primary forms of harm: loss of jobs and loss of government revenue. If the preliminary injunction were granted, the intervenors would suffer both harms but, if the project proceeds, the harms would be mitigated in part once the LOWD plaintiffs' claims are resolved. Relying on the intervenors' data, the project will support about 300 directly and indirectly caused jobs and some $275,000 in revenue to the local governments. These numbers represent the benefits of the entire project, which is scheduled to take place over five years. Under *Sierra Forest*, we must consider only the portion of the harm that would occur while the preliminary injunction is in place, and proportionally diminish total harms to reflect only the time when a

---

[3] Because we determine that the LOWD plaintiffs are likely to succeed on their claim that the USFS must do a supplemental EIS that assesses the impacts on elk of the Snow Basin project without considering the TMP, *see* Part III.A, above, we need not determine whether the balance of equities tips sharply in LOWD's favor under the *Wild Rockies* standard. *Wild Rockies,* 632 F.3d at 1135. Instead, because the LOWD plaintiffs have shown likely success on one claim, we analyze whether the LOWD plaintiffs can show that the balance of harms tips in their favor under the *Winter* standard. *Winter*, 555 U.S. at 20.

preliminary injunction would be in place. Because the jobs and revenue will be realized if the project is approved, the marginal harm to the intervenors of the preliminary injunction is the value of moving those jobs and tax dollars to a future year, rather than the present. The LOWD plaintiffs' irreparable environmental injuries outweigh the temporary delay intervenors face in receiving a part of the economic benefits of the project.

Intervenors also raise a third form of harm, the increased risk of fire danger and insect infestation. This claim has elements of both private and public interest in that the intervenors face a particular harm from the risk of forest fires in their region, separate from the more generalized harm the public faces. However, because the issues involved are substantially similar, we analyze it under the fourth *Winter* prong, below.

## D

"Finally, our precedent requires that we examine the public interest in determining the appropriateness of a preliminary injunction. While we have at times subsumed this inquiry into the balancing of the hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected. The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (internal citations omitted), *abrogated in part on other grounds by Winter*, 555 U.S. at 24. Although "[w]hen the government is a party, these last two factors merge," *Drakes Bay Oyster Co. v. Jewell*, — F.3d —, 2014 WL 114699, at *14 (9th Cir. 2013), the intervenors'

interests in this case make it appropriate to consider the factors separately.

The USFS and intervenors argue that the public interest would be harmed if the preliminary injunction is granted because the risk of forest fires and insect infestation would not be reduced by the logging project as planned. Even though fire and insect risks are to a degree speculative, mitigating such risks is a valid public interest. *See McNair*, 537 F.3d at 1005 (citing *Wildwest Inst. v. Bull*, 472 F.3d 587, 592 (9th Cir. 2006)). We have given this claim great weight when the risk is imminent or the danger has begun. *See Alpine Lakes Prot. Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir. 1975) (per curiam) (holding that an injunction was not in the public interest because many trees at issue were already infested by insects, which made large-scale spreading across other lands inevitable absent logging). That is not the case here. The FEIS states that, if no action is taken, "[f]ire suppression can be expected to continue and be highly successful," and notes the possibility of "periodic insect outbreaks." Without evidence of an imminent threat, we cannot say that the inability to mitigate such risks for a temporary period outweighs the public's interest in maintaining elk habitat and mature trees in the Forest.

Intervenors also cite *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers*, 524 F.3d 938, 949 (9th Cir. 2008), for the proposition that their private harms, discussed above, are also relevant to the public interest analysis based on the economic impact of the added jobs and how the governmental authorities would use their share of the funds, discussing the undeniable benefits to the public of increased school funding and mental health services, among others. In *Bering Strait*,

we were discussing whether the Army Corps of Engineers had erred in granting a permit to a mining project. *Id.* In this context, where we were analyzing a section of the Code of Federal Regulations that explicitly and repeatedly contemplates consideration of economic factors, including the economic impact of projects on neighboring communities, we held that considering the community impact of economic activity was not arbitrary and capricious. Although the continuation or increase of jobs in logging is relevant to the public interest, a part of what must be considered, our analysis of the public interest in the context of a preliminary injunction here is not bound by *Bering Strait*'s analysis of a regulation that is not at issue in this litigation. Although we think intervenors are correct that their private harms deserve to be considered as part of *Winter*'s public interest analysis, we conclude nonetheless that those harms are outweighed by threatened irreparable injury to elk habitat. Important in our analysis is the fact that the economic impacts will not be completely foregone (as they might be were this case about a denial of a permit, like *Bering Strait*, rather than a preliminary injunction). Rather, there is a temporary delay of the economic benefit of jobs while a preliminary injunction is in place. *See Sierra Forest*, 577 F.3d at 1022–23. If the Snow Basin project is approved after trial, then it and the consequent jobs will proceed.

## IV

The LOWD plaintiffs have shown that they are likely to prevail on their NEPA claim regarding the FEIS' discussion of elk habitat because that discussion is insufficiently clear. Therefore, the Environmental Impact Statement's analysis of the project's effects on elk failed to satisfy NEPA's requirements. The LOWD plaintiffs have shown that absent

a preliminary injunction, they are likely to face irreparable harm. The LOWD plaintiffs have shown that the balance of equities tips in their favor. And the LOWD plaintiffs have shown that the public interest supports the granting of a preliminary injunction. We reverse the district court's assessment that the LOWD plaintiffs are not likely to succeed on one claim, affirm the district court's determination that the LOWD plaintiffs are not likely to succeed on other claims, and reverse the district court's holding that the LOWD plaintiffs are not entitled to a preliminary injunction. A preliminary injunction is warranted under the test established by the Supreme Court in *Winter*.

We remand to the district court with instructions for it to enter a preliminary injunction sufficient to protect the status quo while the USFS completes a supplemental environmental impact statement. On remand, the district court should determine whether the entire Snow Basin project must be preliminarily enjoined, or whether a more narrowly tailored preliminary injunction can be crafted that adequately "preserve[s] the status quo and the rights of the parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). We have explained that "[i]njunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion." *Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). In this case, the district court could consider, for example, limiting the injunction to specific areas of elk habitat or to trees above a certain diameter at breast height. As we hold only that the LOWD plaintiffs have adequately established their entitlement to the issuance of a preliminary injunction, however, we express no opinion on the appropriate scope for such an injunction. Rather, we reverse

and remand for further proceedings consistent with this opinion.

Costs on appeal shall be taxed against Appellees. Fed. R. App. P. 39(d)(1); Ninth Cir. Rule 39-1.1. The mandate of this court shall issue immediately upon the running of the deadlines for en banc consideration.

**AFFIRMED in part, REVERSED in part, and REMANDED.**