FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER, *Plaintiff-Appellant*, <br><br> v. <br><br> ANN CARLSON, in her official capacity as the Forest Supervisor of the Mendocino National Forest; UNITED STATES FOREST SERVICE, *Defendants-Appellees*, <br><br> SIERRA PACIFIC INDUSTRIES, *Intervenor-Defendant-Appellee.* | No. 19-17479 <br><br> D.C. No. 3:19-cv-06643-EMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted May 27, 2020
San Francisco, California

Filed August 3, 2020

Before:  William A. Fletcher and Kenneth K. Lee, Circuit
    Judges, and Benjamin H. Settle,* District Judge.

Opinion by Judge W. Fletcher;
Dissent by Judge Lee

## SUMMARY**

### Environmental Law

The panel reversed the district court's order denying
Environmental Protection Information Center ("EPIC")'s
request for a preliminary injunction, challenging the United
States Forest Service's approval of the Ranch Fire Roadside
Hazard Tree Project in Northern California (the "Project").

The Project authorized the Forest Service to solicit bids
from private logging companies for the right to fell and
remove large fire-damaged trees up to 200 feet from either
side of roads in the Mendocino National Forest.  Under the
National Environmental Policy Act, rather than preparing an
Environmental Assessment or an Environmental Impact
Statement for the Project, the Forest Service relied on a
categorical exclusion ("CE") for road repair and maintenance
in 36 C.F.R. § 220.6(d)(4).

---

* The Honorable Benjamin H. Settle, United States District Judge for
the Western District of Washington, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

The panel discussed the requirements for a preliminary injunction.  First, the panel held that EPIC was likely to succeed on the merits of its claim that the Forest Service erred in relying on the CE for road repair and maintenance. The panel noted that the rationale for a CE was that a project that will only have a minimal impact on the environment should be allowed to proceed without an environmental impact statement or an environmental assessment.  The CE upon which the Forest Service relied authorized projects for such things as grading and resurfacing of existing roads, cleaning existing culverts, and clearing roadside brush.  The panel concluded that under no reasonable interpretation of the language of 36 C.F.R. § 220.6(d)(4) did the Project come within the CE for "repair and maintenance" of roads.  Second, the panel held that EPIC submitted evidence of irreparable, although limited, harm.  Third, the panel held that the balance of equities and the public interest weighed in EPIC's favor. The panel reversed the denial of the requested preliminary injunction, and remanded for further proceedings.

Judge Lee dissented.  He would hold that the district court did not abuse its discretion in denying EPIC's request for a preliminary injunction, and he would defer to the agency's actions within its expertise.

**COUNSEL**

Matt Kenna (argued), Public Interest Environmental Law, Durango, Colorado; René P. Voss, Natural Resources Law, San Anselmo, California; for Plaintiff-Appellant.

Jeffrey Bossert Clark (argued), Assistant Attorney General; Eric Grant, Deputy Assistant Attorney General; Sally J.

Sullivan, John P. Tustin, and Jeffrey S. Beelaert, Attorneys; Environment and Natural Resources Division, Washington, D.C.; for Defendants-Appellees.

Sara Ghafouri (argued) and Lawson E. Fite, American Forest Resource Council, Portland, Oregon; Tyler Welti, Venable LLP, San Francisco, California; for Intervenor-Defendant-Appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

In July 2018, the Ranch Fire burned more than 400,000 acres in Northern California, including almost 300,000 acres in the Mendocino National Forest. After the fire, the United States Forest Service approved the Ranch Fire Roadside Hazard Tree Project (the "Project"). The Project authorizes the Forest Service to solicit bids from private logging companies for the right to fell and remove large fire-damaged trees up to 200 feet from either side of roads in the National Forest. Rather than preparing an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") for the Project, the Forest Service relied on a categorical exclusion ("CE") for road repair and maintenance in 36 C.F.R. § 220.6(d)(4). Plaintiff Environmental Protection Information Center ("EPIC") challenges the Forest Service action, contending that the Project does not qualify for the exclusion. The district court agreed with the Forest Service, holding that the Project qualified for the exclusion, and denied a preliminary injunction. We reverse and remand.

## I.  Statutory and Regulatory Framework

The National Environmental Policy Act ("NEPA") "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'"  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting NEPA at 42 U.S.C. § 4332(2)(C)).  "When the Government conducts an activity, NEPA itself does not mandate particular results. Instead, NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008) (internal quotation marks and citations omitted).

An agency can comply with NEPA in three ways.  It can prepare an EIS; it can prepare an EA; or it can invoke a CE. An EIS is the most searching review. It is required for any action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EA is less searching.  Its central function is to determine whether an EIS is required.  40 C.F.R. § 1508.9.  A CE allows an agency to avoid preparing either an EIS or an EA.  CEs are appropriate for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect."  40 C.F.R. § 1508.4.

## II.  Stated Purpose and Criteria of Project

According to Ann D. Carlson, Forest Supervisor for the Mendocino National Forest, "The primary purpose of the Project is to reduce current and potential safety hazards along

roads [in the National Forest] to create a safe transportation system. . . . [T]he Project plans to remove hazard trees through a series of salvage sales." Carlson stated in a declaration in the district court that the Project's "[r]oadside hazard treatments involve removing only trees that constitute hazards to the selected roads . . . and that have the potential to reach roadways."

The vegetation in the burned area of the Mendocino National Forest comprises a variety of forest types, including mixed conifer, oak woodlands, pine, and Douglas fir. A logging company whose bid has been accepted may fell "merchantable hazard trees" of fourteen or more inches diameter at breast height ("DBH") that are "within one and a half tree-heights" of the road. Any tree within 200 feet of the centerline of the road that has been partially burned and has a 50 percent or higher probability of mortality is eligible for felling. For "the roads that run adjacent to the Snow Mountain Wilderness," the Project allows cutting of eligible trees within 100, rather than 200, feet of the centerline. In total, the Project authorizes the logging of millions of board feet of timber on nearly 4,700 acres of National Forest land.

Anthony Saba, a forester/silviculturist employed by the Forest Service, stated in a declaration that merchantable trees in the Project areas range from 60 to 185 feet in height. According to Saba, in one area of the Project, the average tree height is 100 feet; in another, the average height is 111 feet. Under the criteria of the Project, a logging company may cut a 100-foot tree located as far as 150 feet from the road, or a 111-foot tree located as far as 166 feet from the road. At the outer limit of the Project area, a company may cut even taller trees. If a 100-foot tree located 150 feet from the road were to fall directly toward the road at a 90 degree angle, the tip of

the tree would come to the ground 50 feet from the road. If a 111-foot tree located 165 feet from the road were to fall in the same manner, its tip would come to the ground 54 feet from the road. If the trees were to fall at any other angle, their tips would come to the ground at greater distances from the centerline.

### III. Categorical Exclusions

There are two categorical exclusions potentially relevant to the Project. One is for "repair and maintenance" of roads in the National Forest. The other is for "salvage" logging of "fire-damaged trees" on tracts of 250 acres or less. The Forest Service prepared neither an EIS nor an EA for the Project. Instead, it relied on the first CE.

The first CE covers:

> (4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:
>
> > (i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;
> >
> > (ii) Grading a road and clearing the roadside of brush without the use of herbicides;
> >
> > (iii) Resurfacing a road to its original condition;

(iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

(v) Surveying, painting, and posting landline boundaries.

36 C.F.R. § 220.6(d)(4). Neither a "case file and decision memo" nor a "supporting record" is required in order to invoke the CE under § 220.6(d)(4).

The second CE covers:

(13) Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

(i) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees, and

(ii) Harvest of fire-damaged trees.

36 C.F.R. § 220.6(e)(13). A "case file and decision memo" and a "supporting record" are required in order to invoke the CE under § 220.6(e)(13).

## IV. Procedural Background

EPIC filed suit in federal district court on October 16, 2019, contending that the Project does not qualify for the road maintenance and repair CE. As of November 21, 2019, logging had begun in two areas of the Project, and the Forest Service had finalized bidding on a third area. Bidding had not yet begun on the other areas in the Project. The district court entered a temporary restraining order ("TRO") pending its hearing on EPIC's request for a preliminary injunction. On December 4, 2019, the court denied the preliminary injunction and lifted the TRO. EPIC appealed, and we set an accelerated briefing schedule. We heard oral argument on May 27, 2020.

## V. Standard of Review

When deciding whether to issue a preliminary injunction, a district court considers whether the requesting party has shown "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Likelihood of success on the merits is a threshold inquiry and is the most important factor. *See, e.g.*, *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).

We review a grant or denial of a preliminary injunction for abuse of discretion. *See, e.g.*, *United States v. California*, 921 F.3d 865, 877 (9th Cir. 2019). "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter*

*Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). Under the abuse-of-discretion standard, "as long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) (citations and alterations omitted).

## VI.  Discussion

### A.  Likely Success on the Merits

With respect to the Project at issue, the CE for road repair and maintenance is unambiguous.  The CE applies to "repair and maintenance of roads, trails, and landline boundaries." "Repair" and "maintenance" are common words with well-understood ordinary meanings.  In order to ensure that these words are understood in accordance with their ordinary meanings rather than as terms of art, the CE provides examples.  "Repair and maintenance" of roads include "grad[ing], resurfac[ing], and clean[ing] the culverts" of a road; "grading a road"; "clearing the roadside of brush without the use of herbicides"; and "resurfacing a road to its original condition." 36 C.F.R. § 220.6(d)(4)(i)–(iii).  The CE specifies that the "repair and maintenance" are not limited to these examples, but the clear inference (even without invoking the principle of ejusdem generis), is that other examples should be similar in character to the examples provided.

The question before us is whether an extensive commercial logging project that includes felling large, partially burned "merchantable" trees—including 100- and 111-foot trees located 150 and 166 feet from roads, as well as

taller trees even farther away—is "repair and maintenance" within the meaning of § 220.6(d)(4). In her declaration in the district court seeking to justify the "repair and maintenance" CE, Forest Supervisor Carlson repeatedly referred to all the trees to be felled under the Project as "hazard trees." While all of the trees within the scope of the Project may be hazardous in some sense, many of them pose no imminent hazard. As described above, a number of the trees will not come close to the road even if they fall directly toward it.

We have no doubt that felling a dangerous dead or dying tree right next to the road comes within the scope of the "repair and maintenance" CE. But the Project allows the felling of many more trees than that. The rationale for a CE is that a project that will have only a minimal impact on the environment should be allowed to proceed without an EIS or and EA. The CE upon which the Forest Service relies authorizes projects for such things as grading and resurfacing of existing roads, cleaning existing culverts, and clearing roadside brush. A CE of such limited scope cannot reasonably be interpreted to authorize a Project such as the one before us, which allows commercial logging of large trees up to 200 feet away from either side of hundreds of miles of Forest Service roads.

Plaintiff EPIC argues that the CE for salvage logging, 36 C.F.R. § 200.6(e)(13), is the only potentially applicable CE for salvage logging of fire-damaged trees. According to EPIC, no project that allows salvage logging over an area that exceeds 250 acres is eligible for a CE. At an earlier time, when the salvage logging CE was first adopted, the Forest Service may have agreed with this position, as EPIC contends. But it is clear that even if it once agreed, the Forest Service no longer agrees. The current position of the Forest

Service is that the CEs for road repair and maintenance and for salvage logging overlap. That is, in the view of the Forest Service, if a project that allows felling of dangerous trees near roads comes within the CE for repair and maintenance, that CE is available even if the total area of the project is greater than 250 acres.

In the case before us, we need not go so far as EPIC's argument would take us. The Project does not target only trees that pose an immediate danger to travelers. We therefore need not decide the question that would be presented, for example, if a post-fire salvage logging project allowed felling of dead and dying trees up to only 20 feet back from 100 miles of Forest Service roads, such that the area covered by the project would be more than 250 acres. Nothing close to that question is now before us.

The Project at issue provides substantial revenue to the Forest Service. It allows logging of commercially valuable trees up to 200 feet on either side of the road; allows felling of partially burned trees that have a 50 percent or higher chance of mortality; allows felling of large trees at such distances from the road that their tips will be 50 or more feet from the road even if the tree falls directly toward the road; and allows logging over an area of approximately 4,700 acres. Under no reasonable interpretation of its language does the Project come within the CE for "repair and maintenance" of roads.

## B.  Irreparable Harm

"Ongoing harm to the environment constitutes irreparable harm warranting an injunction. When a project may significantly degrade some human environmental factor,

injunctive relief is appropriate." *Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (noting that environmental harm "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable").

Kimberly Baker, a member of EPIC, submitted an affidavit in the district court stating that her enjoyment of the National Forest will be diminished if extensive logging were to occur for 200 feet on either side of the roads running through the burned area of the National Forest, as would be allowed under the Project. She wrote, "[I]f the Forest Service were to prepare an Environmental Assessment or Environmental Impact Statement, it would have to include alternatives to the planned logging. Alternatives . . . could include leaving the living trees standing, retaining more trees on the downhill side of the road and some of the downed hazard logs on the ground, which would be extremely helpful to wildlife and soil health and improve my enjoyment of the affected areas if such alternatives were chosen." Baker also submitted two research articles addressing the effects of logging on post-fire landscapes.

## C.  Balance of Equities and the Public Interest

When "the government is a party, we consider the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). If irreparable environmental injury "is sufficiently likely," as in this case, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*,

480 U.S. at 545. We conclude that the balance of the equities and the public interest weigh in EPIC's favor.

The Forest Service argues that the balance of equities and the public interest favor it rather than EPIC. It contends that the harm suffered by EPIC and its members is relatively minor. The area covered by the Project is on either side of roads in the burned areas of the National Forest and is therefore easily visible to virtually all visitors to the Forest, but the Forest Service points out that it comprises only 1.6 percent of the total burn area. On the other side of the ledger, the Forest Service argues the balance of equities and the public interest favor the Service "because [the Project] seeks to reduce the threat to public safety and to preserve long-term forest health."

We of course agree with the Forest Service that public safety is important. In part, the Project serves that interest directly, to the extent that some of the trees that would be felled are undoubtedly dangerous to travelers. But as discussed above, the Project allows felling of trees that are at such a distance from roads that their tips will never come close to the edge of the road, even if the trees fall directly toward the road at a 90 degree angle. Further, commercial logging companies working under the Project will not fell hazardous trees smaller than 14 inches DBH, even if the trees are right next to the road. But the Project also indirectly serves the interest of public safety. As Forest Supervisor Carlson points out in her declaration, revenue from the Project will allow the Forest Service to pay for the felling of such trees. This is a valid and important point, but we note the obvious: A budgetary system that requires the authorization of commercial salvage logging operations in order to finance work necessary for public safety can put the

Forest Service in an awkward and conflicted position in deciding whether, and under what conditions, to authorize such operations. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1309 (9th Cir. 2003) (Noonan, J., concurring).

We also of course agree with the Forest Service that the preservation of long-term forest health is important. We are not in a position to second-guess the Forest Service as to whether the logging authorized by the Project furthers that goal, and we defer to the Forest Service's considered judgment that it does.

In the end, however, we are not persuaded that public safety will actually be put at risk by granting the relief EPIC seeks. EPIC has never denied the Forest Service's right to rely on the CE for road repair and maintenance in order to fell trees next to the road that pose an immediate danger to users of the road. To the extent the Forest Service authorizes salvage logging that constitutes more than repair and maintenance, EPIC seeks only the preparation of an EIS or an EA. The Forest Service has not shown that fulfilling its obligation to prepare an EIS or an EA is inconsistent with the goal of public safety.

The public interest is served by requiring the Forest Service to comply with the law. We have concluded, above, that the Project does not qualify for the CE for road maintenance and repair. The Forest Service must therefore prepare either an EIS or an EA.

## Conclusion

We conclude that EPIC will succeed on the merits of its claim; that it will suffer irreparable, though limited, harm;

and that it has demonstrated that the balance of equities and the public interest weigh in its favor. We therefore reverse the district court's denial of the requested preliminary injunction and remand for further proceedings not inconsistent with this opinion.

**REVERSED** and **REMANDED**.

LEE, Circuit Judge, dissenting:

The Ranch Fire Roadside Hazard Tree Project (the "Project") may not be optimally designed for the reasons outlined by the majority. But big problems often require big and imperfect solutions. And under a deferential standard of review, we should not second-guess an imperfect plan fashioned by the United States Forest Service, even if we could have crafted a better tailored one.

The Ranch Fire burned nearly 410,000 acres of land, earning its title as the largest wildfire in California's history. About 288,000 acres of the burned area is in the Mendocino National Forest. Over 770 miles of public roads that allow visitors to access the Forest for recreation and respite are now threatened by charred trees, some of which tower over the landscape up to 185 feet in height. If these trees fell on public roads, the lives of visitors, first responders, and United States Forest Service personnel would be placed in grave danger.

The Forest Service responded with an imperfect but workable solution: Salvage operators will remove at their expense dying trees that threaten high-priority roadways and pay the Forest Service for that privilege. The Project's criteria

are sufficiently strict, requiring operators to remove only what is reasonably necessary to further road safety and maintenance. Trees eligible for removal must be 14 inches in diameter at breast height, they must be within one and a half times their individual height distance from the road, and they must have a 50% or greater likelihood of mortality. In other words, eligible trees must be large, able to strike the road, and at least halfway dead. According to the declaration of Mendocino National Forest Supervisor Ann Carlson, timber sales are the primary means to fell thousands of hazardous trees because it is "highly unlikely" that the Service "could obtain sufficient appropriated funds [from Congress] to accomplish all project activities." The Forest Service estimates that the cost to the agency would be about $5.5 million otherwise.

While I share majority's concerns about some aspects of the Project, I respectfully dissent because we must defer to the Forest Service's plausible plan and the district court's denial of preliminary injunction.

\* \* \* \* \*

Our review is limited by a double dosage of deference. First, we review the district court's denial of a preliminary injunction for abuse of discretion. *See United States v. California*, 921 F.3d 865, 877 (9th Cir. 2019). This is a highly deferential standard. A district court's decision "will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) (citations and alterations omitted).

Second, we need to be mindful that our review is further limited in a challenge to an agency action. Under the Administrative Procedure Act, "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for the Env't v. USFS*, 189 F.3d 851, 857 (9th Cir. 1999). Courts uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007) (citation and internal quotation marks omitted). A court considers whether "the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Above all else, "we do not substitute our judgment for that of the agency." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1074 (9th Cir. 2011) (internal citation omitted).

**The district court did not abuse its discretion in denying EPIC's requested preliminary injunction.**

Plaintiffs seeking a preliminary injunction carry a heavy burden. A plaintiff must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). As the majority notes, likelihood of success on the merits is most important and typically dispositive. *See Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). When,

as here, "the government is a party, we consider the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

    1. *The district court did not abuse its discretion in finding that EPIC did not show a likelihood of success on the merits.*

The majority questions two aspects of the Project: the 200-foot project area that extends outward from the roadway's centerline, and the one and a half height modifier for determining which trees are potentially capable of striking the road. While we can question some of the assumptions and analyses provided by the Forest Service, the record shows a sufficient basis for the agency's decisions.

In his declaration, Anthony Saba, a forester and silviculturist for the Forest Service, stated that the 200-foot boundary "was intended to capture the heights of most of the hazard trees that had the potential to reach the roadways within this Project area based on an estimated tree height average of approximately 100 feet." Mr. Saba also noted that trees in the Project area vary between 60 and 185 feet in height. Thus, if trees exist within the Project area up to 185 feet in height, then they may threaten a road that has a centerline at maximum 200-feet away from such trees and thus the 200-foot boundary is reasonable.

The Forest Service's reliance on the 1.5 tree height distance modifier poses a more difficult question. The majority states that it has "no doubt that felling a dangerous dead or dying tree right next to the road comes within the scope of the 'repair and maintenance' CE [categorical exclusion]. But the Project allows the felling of many more

trees than that." Maj. Op. at 11. To prove this, the majority notes that a 100-foot-tall tree that meets the other criteria is eligible for removal if it is within 150 feet of the road. They hypothesize that this tree does not threaten the road system because even if it fell perpendicular to the road, its tip would still land 50 feet away. So, the majority argues, the repair and maintenance categorical exclusion does not apply.

The legitimacy of the tree height modifier thus becomes a paramount issue in this case. If the agency reasonably concluded that the modifier accurately reflects the potential damage area when a tree falls, then the "repair and maintenance" categorical exclusion would presumably apply. In other words, if the majority's hypothetical 100-foot tree that sits 150 feet from the road poses an actual risk to the road system, then the repair and maintenance categorical exclusion would cover the felling of that tree.

The majority concludes, however, that the modifier is not legitimate because the hypothetical 100-foot tree would extend only 100 feet on the ground once it fell, putting it well away from the road. But the agency provided a reasonable and plausible — though not indisputable — basis for the modifier. Namely, decayed trees can sling detritus like branches and limbs when falling; the tree's final resting place on the ground does not reflect a one-to-one relationship with its height. The Forest Service's Hazard Tree Guidelines note: "When a tree or tree part fails, it may strike other trees or debris on the ground and fling material a considerable distance." These conditions can be exacerbated by other factors, too, like wind, breakage forces, and slope. I agree with the majority that there are a limited number of angles that a tree might fall to pose an actual threat to a public road. But we cannot know the exact direction a tree will fall until

it does. While we may question whether the Forest Service's use of a 1.5 tree height modifier reflects the most accurate or efficient criterion, it is not arbitrary or capricious and we must defer to the agency's expertise in this area. *See Save the Peaks Coal. v. USFS*, 669 F.3d 1025, 1035 (9th Cir. 2012) ("Under the APA, [an] agency's decision may be set aside *only* if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (emphasis added) (internal citations omitted)); *see also* 5 U.S.C. § 706(2)(A).

Moreover, the record convinces me — as it did the district court, which believed the Project "impos[es] a meaningful limit against a free-for-all harvest" — that the Service does not intend to mark every eligible tree in the Project area. For example, Mr. Saba stated in his declaration that otherwise eligible trees would not be marked for removal by the Forest Service where geographic blockages (like rock outcroppings) would prevent the trees from striking a road. He stated that "[t]ree marking crews are trained to account for these variances, and to only mark trees meeting the criteria that have an actual potential to impact Forest roadways."

While the Project may be imperfect and we may question the wisdom of some of the assumptions, I cannot say that the Forest Service's decisions were arbitrary or capricious. Nor can I say that district court abused its discretion in finding that EPIC failed to show that it was likely to succeed on the merits of their claim.

2.  *Irreparable harm, the balance of equities, and the preliminary injunction being in the public's interest are closer calls than the majority recognizes.*

The district court did not abuse its discretion in finding that EPIC failed to show a likelihood of success on the merits of its claim. That alone should end our inquiry. *See Edge*, 929 F.3d at 663. But the remaining preliminary injunction factors are a closer call than the majority recognizes.

The majority correctly notes that ongoing harm to the environment may constitute irreparable harm, but it is not clear that Project will lead to such damage. While some portions of the Project overlap with critical habitat for spotted owls, a Forest Service biologist concluded that the Project is unlikely to adversely affect spotted owl habitat.

As for the balance of equities and whether the preliminary injunction is in the public's interest, the majority concludes that these factors favor EPIC because "EPIC seeks only the preparation of an EIS or an EA," and that "[t]he public interest is served by requiring the Forest Service to comply with the law." Maj. Op. at 15. But Ms. Carlson makes clear in her declaration that without these timber sales, the Service will be forced to close roads and recreation areas on a long-term basis. Certainly, the public has a strong interest in enjoying trips to Mendocino National Forest. The public also has an interest in protecting taxpayers' money through sound management by the Forest Service. I do not believe the majority's opinion adequately considers these countervailing concerns. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of

injunction."); *see also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("Both the economic and environmental interests are relevant factors, and both carry weight in this analysis.").

In sum, I believe that the district court did not abuse its discretion in denying EPIC's request for a preliminary injunction, and that we must defer to the agency's actions within its expertise. I thus respectfully dissent.