**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOUNTAIN COMMUNITIES FOR FIRE SAFETY; LOS PADRES FORESTWATCH; EARTH ISLAND INSTITUTE, *Plaintiffs-Appellants*, v. KEVIN ELLIOTT, in his official capacity as the Forest Supervisor of the Los Padres National Forest; UNITED STATES FOREST SERVICE, *Defendants-Appellees.* | No. 20-55660 D.C. No. 2:19-cv-06539-CAS-AFM OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted May 12, 2021
Pasadena, California

Filed February 4, 2022

Before: Ryan D. Nelson and Kenneth K. Lee, Circuit
Judges, and Sidney H. Stein,* District Judge.

---

*The Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, sitting by designation.

Opinion by Judge Lee;
Dissent by Judge Stein

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment for the U.S. Forest Service in an action brought by several nonprofit groups concerning the Service's proposed timber project of "thinning" overcrowded areas in Cuddy Valley within Los Padres National Forest.

U.S. Forest Service regulation 36 C.F.R. § 220.6(e)(6) allows "timber stand improvement" activities such as "thinning . . . to reduce fire hazard" ("CE-6" exemption).

The panel held that CE-6 – the "Timber Stand Improvement" categorical exclusion – allows for thinning of larger commercially viable trees, and is not limited to thinning small saplings. First, the National Environmental Policy Act ("NEPA") permits categorical exclusions to proceed without an environmental impact statement or an environmental assessment. The panel held that CE-6 unambiguously allowed commercial thinning, and, therefore, it need not consider whether it must give *Auer* deference to the Forest Service's interpretation of CE-6.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Second, CE-6 is not genuinely ambiguous and allows for commercial thinning. The plain language of CE-6 is clear. It does not limit activities based on tree age or size; rather it allows for timber stand improvement. In addition, the phrase "timber stand improvement" itself does not limit tree age or size. The panel further held that the Forest Service was not bound by the 2014 Forest Service Manual definition of "stand improvement." The panel rejected appellants argument that other categorical exceptions implicitly limited CE-6's scope.

The panel held that the Forest Service's decision to apply CE-6 to the project was not arbitrary and capricious. Because the Cuddy Valley Project authorized thinning to reduce "stand density, competing vegetation, and fuels" and will not require the use of herbicides or any road construction, the Forest Service reasonably determined that it fell within the scope of CE-6. Also, when analyzing whether extraordinary circumstances prevented the use of CE-6, the Forest Service did not have to examine the NEPA intensity factors listed at 40 C.F.R. § 1508.27. Finally, the Forest Service adequately considered the resource conditions listed at 36 C.F.R. § 220.6(b).

The Forest Service did not violate the National Forest Management Act ("NFMA") in determining that the project tracked the Los Padres Forest Plan's Aesthetic Management Standards. The panel rejected appellants' NFMA-related arguments. The Forest Service did not have to issue explanatory documentation when the project was authorized. Although NFMA regulations promulgated later require a document describing how proposed activities follow the forest plan, 36 C.F.R. § 219.15(d), such regulations do not apply to plans that predate their enactment; and the Los Padres Forest Plan predated those recent regulations.

Moreover, the Forest Service's articulated rationale was not a mere post hac rationalization. In addition, the Forest Service's conclusion that the project met the Scenic Integrity Standards in the Forest Plan was not arbitrary and capricious.

District Judge Stein dissented because he would find, employing all the traditional tools of statutory construction, that the CE-6 exemption unambiguously prohibits the Forest Service from performing commercial thinning of trees pursuant to CE-6. He disagreed with Part I.B of the majority's analysis and would reverse the district court's denial of appellants' motion for summary judgment.

## COUNSEL

Matt Kenna (argued), Public Interest Environmental Law, Durango, Colorado; René P. Voss, Natural Resources Law, San Anselmo, California; for Plaintiffs-Appellants.

Ana T. Katselas (argued), David Gunter, and Erika Danielle Norman, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Stephen Vaden, General Counsel; Jamie Rosen, Attorney; Office of the General Counsel, United States Department of Agriculture, Washington, D.C.; for Defendants-Appellees.

Sara Ghafouri and Lawson E. Fite, American Forest Resource Council, Portland, Oregon, for Amicus Curiae American Forest Resource Council.

**OPINION**

LEE, Circuit Judge:

The U.S. Forest Service is at loggerheads with several nonprofit groups over its proposed project of "thinning" overcrowded areas in Cuddy Valley within Los Padres National Forest. If some trees are not "thinned"—*i.e.,* removed—the forest will face increased risks of wildfires, and insects and diseases may ravage the trees, according to the Forest Service. The nonprofit groups, on the other hand, raise the specter of swaths of large trees being slashed and sold by the government with little regard for environmental impact. The Cuddy Valley Project thus implicates complex questions and competing public policy goals.

Our task today, however, is much simpler and more straightforward: Does a U.S. Forest Service regulation allowing "timber stand improvement" activities such as "thinning . . . to reduce fire hazard" include "commercial thinning" (*i.e.*, the cutting of large and commercially viable trees that may be sold by the Forest Service to private parties)? 36 C.F.R. § 220.6(e)(6) ("CE-6" exemption). If so, then the Forest Service can rely on this so-called "CE-6" exemption to move forward with its project to thin trees—without having to prepare an environmental impact statement ("EIS") or an environmental assessment ("EA") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*

We hold that the CE-6 exemption unambiguously allows the Forest Service to thin trees, including larger commercially viable ones, to reduce fire hazard without having to conduct an EIS or EA. Its plain language does not limit thinning by tree age, size, or type. Nor is thinning defined to exclude commercial thinning. If the thinning

project reduces fire hazard and meets certain other conditions, CE-6 greenlights the project, even if it means felling commercially viable trees. And under our deferential review of agency action, we hold that the Forest Service did not act arbitrarily and capriciously in invoking the CE-6 exemption for the project.

We also hold that the Forest Service did not violate the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, which sets certain aesthetic management standards. The Forest Service did not have to explain how the project would meet such standards. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1034 (9th Cir. 2020). In any event, the Forest Service did explain how the project area would retain sufficient scenic integrity.

We thus affirm the district court's summary judgment for the Forest Service.

## BACKGROUND

## I. The Forest Service Identifies Ecological Challenges in Cuddy Valley.

Cuddy Valley lies nestled in Los Padres National Forest. It is part of the Mt. Pinos Place area, where single-leaf pinyon-California juniper woodlands and forests dominate the low-elevation landscape, while large, old-growth Jeffrey pine dominate the high-elevation landscape. But after years of human-directed suppression of the natural process of wildfires, the forest in Cuddy Valley has become overcrowded with vegetation.

Overcrowding increases the risk of tree loss to insects, disease, severe wildfire, and drought-related mortality. It makes trees more vulnerable to widespread insect and

disease outbreaks by forcing trees to compete for moisture, sunlight, and nutrients. In 2012, the National Insect and Disease Forest Risk Assessment identified the Cuddy Valley Project area as being at risk for two species of bark beetles. Many of the Jeffrey and pinyon pine trees in the project area are at "imminent risk" of bark beetle-associated mortality because of overcrowding. Modeling of insect and disease risk for the proposed project area shows a "moderate to high risk of mortality" from these beetles, and the Forest Service has reported pockets of five-to-twenty dead trees throughout the area as a result.

Overcrowding also heightens the risk of major wildfire because of the increase in forest fuels such as shrubs, brush, and tree branches. When they accumulate, they act as "fuel ladders" for wildfire to climb from the forest floor to tree canopies. Dense forest canopies also allow the fire to spread rapidly from treetop to treetop in a "crown fire." High intensity crown fires threaten the structure and health of the forest itself. Since 1998, fifteen fire starts (extinguished with fewer than ten acres burned) have spread throughout the Cuddy Valley treatment areas, and four fires have ravaged more than one thousand acres of land within or next to the Cuddy Valley Project area.

## II. The Forest Service Authorizes the Cuddy Valley Project.

To address the overcrowding problem, the Forest Service proposed the Cuddy Valley Project. It covers about 1,200 acres and consists of grasses and shrubs that evolve into pinyon pine and mixed conifer forests. The project would authorize thinning trees and vegetation, which the Forest Service claims would address the overcrowding problems by reducing "stand density, competing vegetation, and fuels."

The project has two main components.  First, it proposes thinning, pruning and otherwise treating smaller trees and shrubs, and then burning the fallen branches, mulch, and other leftover fuel.  Second, it would cut commercially viable trees and mechanically harvest them for sale.  The project would allow commercial logging of up to 601 acres of Jeffrey pine and pinyon-juniper forest.

The Forest Service proposes to restore the overcrowded forest to historical density levels of about 93 trees per acre; currently, there are about 480 trees per acre.  The Forest Service intends to remove trees "throughout all diameter classes" but will limit the trees selected for logging in several ways.  First, it will retain (1) Jeffrey pine trees that are not infected with dwarf mistletoe, and (2) black oak trees unless individual trees pose a hazard.  Second, it will apply a presumption in favor of Jeffrey and pinyon pine when determining which trees will remain uncut.

## III.    Appellants Sue to Enjoin the Cuddy Valley Project.

In March 2018, the Forest Service sent letters to interested parties seeking comments on the proposed project and released its project proposal.  During the public comment period, the Forest Service received over 600 letters: 13 original letters and 587 form letters requesting the Forest Service not to log trees or clear vegetation in the project area.  Appellants—two conservation groups and one community organization—submitted comments detailing their concerns that the project would affect sensitive plant and animal species, as well as increase the potential for severe wildfire and invasive species of plants.

U.S. Forest Service Supervisor Kevin Elliott issued a decision memorandum in November 2018 announcing that the agency would proceed with the project to "improve forest health near communities in Cuddy Valley by reducing overstocking, surface and ladder fuels, reduce fire intensities, and make stands more resilient to disturbance (i.e. bark beetle, drought, and wildfire)." He acknowledged public concern about the impact to wildlife but stated that the project would not "imperil species of concern."

Appellants filed a complaint, alleging that the Forest Service had violated both NEPA and NFMA in approving the Cuddy Valley Project. Both sides moved for summary judgment. The district court granted the Forest Service's motion for summary judgment and denied Appellants' motion for summary judgment. Appellants filed a notice of appeal.[1]

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011). The Administrative Procedure Act (APA) sets the standards for our review of agency decisions under NEPA and NFMA. Under the APA, we set aside agency action only if we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Idaho Sporting Cong., Inc. v.*

---

[1] Appellants assert that they have associational standing to sue. We agree. Appellants have associational standing because their "members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).

*Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citing 5 U.S.C. § 706).

## ANALYSIS

### I. CE-6—the "Timber Stand Improvement" Categorical Exclusion—Allows for Thinning of Commercially Viable Trees.

This case centers on interpretation of a single regulation: Does CE-6 permit thinning larger commercially viable trees? Or is it limited to thinning small saplings only? Based on the plain language of CE-6, we hold that it allows for commercial thinning.

#### A. NEPA permits categorical exclusions allowing projects to proceed without an EIS or EA.

Congress enacted NEPA to establish a national policy for the environment. It also established a Council on Environmental Quality (CEQ), which promulgates "binding regulations implementing the procedural provisions of NEPA." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989); *see also* 42 U.S.C. § 4344(4).

Relevant here, NEPA directs federal agencies to prepare an environmental impact statement (EIS) for proposed "actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The agency must draft an EIS, notice it for public comment, respond to the comments, and then make an ultimate decision. Not surprisingly, though CEQ regulations limit the usual EIS to

150 pages, 40 C.F.R. § 1502.7, in practice an EIS can be a time-consuming regulatory hurdle.[2]

But an agency need not immediately move forward with an EIS.  CEQ regulations allow an agency to first prepare a less demanding environmental assessment (EA) to determine whether the environmental impact is "significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing 40 C.F.R. § 1508.9).  An EA thus allows an agency to avoid an EIS if the EA shows that the environmental impact is not significant enough.

Finally, an agency may avoid preparing an EIS or EA if it decides that a proposed project fits within a specified categorical exclusion ("CE").  40 C.F.R. § 1508.4.  A categorical exclusion covers activities that a federal agency has found "do not have a significant effect on the human environment."  40 C.F.R. § 1507.3(e)(2)(ii).  The Forest Service adopts these exclusions in its NEPA Handbook after public review and comment and in consultation with CEQ. NEPA Proc., 73 Fed. Reg. 43,084, 43,091 (July 24, 2008).

The categorical exclusion at issue is CE-6.  Established in 1992, CE-6 applies to "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of

---

[2] In fact, the CEQ recently issued a report on the length, by page count, of EISs, which found the median EIS length to be 403 pages.  Only 7 percent were 150 pages or shorter, and only 25 percent were 300 pages or less.  CEQ noted that the length of EISs may be influenced by a number of factors, including "considerations relating to potential legal challenges."  *See* Update to Reguls. Implementing the Proc. Provisions of NEPA, 85 Fed. Reg. 1684–01, 1688 (Jan. 10, 2020) (to be codified at 40 C.F.R. § 1502.7).

herbicides or do not require more than 1 mile of low standard road construction," including activities such as:

    i.   Girdling trees to create snags;

    ii.  *Thinning or brush control to improve growth or to reduce fire hazard* including the opening of an existing road to a dense timber stand;

    iii.  Prescribed burning to control understory hardwoods in stands of southern pine; and

    iv.  Prescribed burning to reduce natural fuel build-up and improve plant vigor.

36 C.F.R. § 220.6(e)(6) (emphasis added).   The Forest Service originally introduced CE-6 in the Forest Service Handbook, but later codified it in the Code of Federal Regulations in 2008.  *See* 73 Fed. Reg. at 43,084.

Here, the Forest Service determined that CE-6 applies to the project because thinning is a timber stand improvement activity.  That meant that the Cuddy Valley Project could move forward without an EA or EIS.  Appellants, however, argue that CE-6 permits the Forest Service to thin *precommercial* saplings only, and that it does not permit the agency to cut larger commercially viable trees without an EIS or EA.

We must now decide whether CE-6 limits timber stand improvement activities by the age or size of trees (*i.e.,* whether CE-6 limits thinning to only precommercial saplings).  The Supreme Court has held that an agency's reasonable interpretation of its own ambiguous regulation

controls unless such interpretation is plainly erroneous or inconsistent with the regulation.  *See Auer v. Robbins*, 519 U.S. 452, 453 (1997).  But the Court has recently retrenched on this *Auer* deference: The "possibility of deference can arise only if a regulation is genuinely ambiguous."  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (setting several threshold inquiries before giving *Auer* deference).  If the regulation is unambiguous and "there is only one reasonable construction of a regulation," then we have "no business deferring to any other reading."  *Id.* at 2415.  That is so because deferring to an agency's interpretation of its own regulation "creates a systematic judicial bias in favor of the federal government, the most powerful of parties, and against everyone else." *Id.* at 2425 (Gorsuch, J., concurring) (citation and quotation marks omitted).

Here, because we hold that CE-6 unambiguously allows commercial thinning, we need not consider whether we must give *Auer* deference to the Forest Service's interpretation of CE-6.[3]  *See id.* at 2415–16.

## B. CE-6 is not genuinely ambiguous and allows commercial thinning.

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir. 2015).  We thus "must exhaust all the 'traditional tools' of construction" in interpreting a

---

[3] But given that the Forest Service's interpretation mirrors our own interpretation, we would likely find the Forest Service's interpretation reasonable and entitled to controlling weight even if the regulation were considered truly ambiguous.

regulation. *Kisor*, 139 S. Ct. at 2415–16. But, of course, "the starting point of our analysis must begin with the language of the regulation." *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002).

### 1. *CE-6's language does not restrict thinning.*

The plain language of CE-6 is clear. It does not limit activities based on tree age or size. 36 C.F.R. § 220.6(e)(6). Rather, it allows for timber stand improvement so long as such activities "do not include herbicides or do not require more than 1 mile of low standard road construction" (neither of which applies here). *Id.* The regulation also does not carve out an exception for commercial thinning. The question then is whether the phrase "timber stand improvement" itself limits tree age or size. We hold that it does not.

The most helpful place to start is CE-6's list of examples of timber stand improvement activities. These examples, functioning like a definition provision, guide the court's analysis. *Cf. Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 990–91 (9th Cir. 2020) (noting "the clear inference" from a CE's list of examples "is that other examples should be similar in character to the examples provided"). Relevant here is the second example: "[t]hinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand." 36 C.F.R. § 220.6(e)(6).

This example confirms that timber stand improvement includes commercial thinning. Appellants contend that "thinning" is limited to smaller trees. But CE-6's language includes no modifier for the term "thinning." Nor is there any indication that "thinning" was intended to be used in

anything but its general and ordinary sense. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012) ("ordinary meaning of the word" controls "unless the context in which the word appears indicates" otherwise). In similar contexts, we have construed common words (such as "thinning") according to their normal and ordinary meaning. *See Carlson*, 968 F.3d at 990 ("'repair' and 'maintenance' are common words with well-understood ordinary meanings").

To "thin" generally means to "render less crowded or close by removing individuals; hence, to reduce in number." *Thin, Oxford English Dictionary* 941 (2d. ed. 1991) (same definition); *see also Thin, Webster's Third New Int'l Dictionary* 2376 (1993) ("to remove surplus plants or trees . . . so as to improve the growth of the rest"). So, "thinning" a stand of trees simply means rendering it less crowded by removing some trees. And when the "words of a [regulation] are unambiguous, then, this first canon [of relying on the text of the statute or regulation] is also the last: judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).[4]   That is so because "[o]nly the text of a regulation goes through the procedures established by Congress for agency rulemaking. And it is that text on which the public is entitled to rely." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 131 (2015) (Thomas, J., concurring).  Thus, CE-6's example shows that "timber stand improvement"

---

[4] When the language is clear as it is here, we need not look to "history" or "purpose" of a regulation, as suggested by the dissent. Indeed, to do so sometimes amounts to an invitation for a freewheeling judicial inquiry, given the often amorphous or conflicting history or purpose of a regulation. *See Conroy v. Aniskoff*, 507 U.S. 511, 519–20 (1993) (Scalia, J., concurring) (legislative history is often indeterminate).

includes thinning without limitations based on tree age or size.

Perhaps recognizing that the plain meaning of "thinning" forecloses their argument, Appellants would rather focus on their proposed definition of the term "timber stand improvement," which they contend shows that "thinning" is limited to precommercial saplings. This argument has little merit. For starters, it would be highly odd to conclude that a party's proffered definition—which is not in the regulation—somehow prohibits the very thing explicitly allowed in the regulation.

In any event, the phrase "timber stand improvement" does not limit activity by tree age or size, contrary to Appellant's assertion. The phrase "timber stand improvement" is a term of art, so we cannot depend only on dictionaries to discern its meaning. *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) ("Sometimes context indicates that a technical meaning applies. Every field of serious endeavor develops its own nomenclature—sometimes referred to as *terms of art* . . . . which often differ[] from common meaning"). Rather, "we examine contemporaneous sources to determine the legal meaning of the term at the time Congress employed it in the statute." *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017).

CE-6 was adopted in 1992, so we need to look at sources around that time period to help explain the objective meaning of the term of art, "timber stand improvement." *See* 57 Fed. Reg. 43,180 (Sept. 18, 1992). The 1990 Forest Service Manual was operative at that time, and it directs readers to The Society of American Foresters' publication "Terminology of Forest Science, Technology, Practices, and Products." The Manual describes that publication "as the

recognized basis for silvicultural [tree] terminology and definitions." The Society of American Foresters, in turn, defines "timber stand improvement" as "[a] loose term comprising all intermediate cuttings made to improve the composition, constitution, condition and increment of a timber stand." Society of American Foresters, Terminology of Forest Science, Technology, Practices, and Products 277 (F.C. Ford-Robertson ed., 1971).

This definition reveals that "timber stand improvement" is a broad concept. It does not limit cuttings to only precommercial trees or saplings. Instead, it represents a "loose" term encompassing "all" intermediate cuttings.[5] The project here allows for cutting both commercial and precommercial trees to reduce fire and pest risk, and falls within the scope of "timber stand improvement."

The dissent points out that the 1990 Forest Service Manual included "precommercial thinning" as an example of "Kinds of Timber Stand Improvement" for purposes of "work planning and reporting." FSM § 2476.3 (1990). But there is no indication that the list of examples was intended as exclusive or exhaustive, or that this example for "work planning and reporting" was intended to define "timber stand improvement" generally.[6] In fact, the 1990 Forest Service

---

[5] "Intermediate cutting" is defined in turn as: "Any removal of trees from a regular crop or stand between the time of its formation and the harvest cutting. NOTE: Generally taken to include cleaning, thinning, liberation and improvement cuttings, increment fellings and sometimes even salvage and sanitation cuttings." Society of American Foresters, *supra*, at 144.

[6] Moreover, contrary to the dissent's understanding, "release" could include cutting older, commercially viable trees. Release is the practice of removing competing vegetation so that the younger saplings

Manual elsewhere undercuts the dissent's proposed reading because it authorizes the Forest Service to "[a]ccomplish timber stand improvement objectives to the extent possible by *commercial sale . . . of timber* and other forest products." FSM § 2476.03 (1990) (emphasis added).  It further notes that the agency can seek timber stand improvement "by Timber Sale"—i.e., to "[h]andle as a timber sale, *any material* to be cut or killed in a stand improvement project that *can be sold as stumpage* or other product."  *Id.* § 2476.51 (emphases added).[7]

In sum, the plain language of CE-6, along with the best contemporaneous meaning of "timber stand improvement," leads us to conclude that CE-6 allows for both commercial and precommercial thinning of trees (if it does not involve the use of herbicides or more than one mile of low standard road construction).

---

themselves can thrive.  It thus contemplates removing older, overhead trees to free up space for the young saplings to grow.

[7] In any event, the Ninth Circuit has made clear "that the [Forest Service] Manual does not have the force of law and does not bind the agency."  *Forest Guardians v. Animal & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002).  "In order for a regulation to have the 'force and effect of law,' it must have certain substantive characteristics and be the product of certain procedural requisites."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979).  In *Western Radio Services Co. v. Espy*, we held that the Forest Service Manual and Handbook "do not have the independent force and effect of law" because "the Manual and Handbook are not substantive in nature" and "are not promulgated in accordance with the procedural requirements of the Administrative Procedure Act."  79 F.3d 896, 901 (9th Cir. 1996).  Thus, the Forest Service Manual and Handbook "do[] not have the independent force and effect of law."  *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

   2. *The Forest Service is not bound by the 2014 Forest Service Manual definition of "stand improvement."*

Ignoring the contemporaneous definition of "stand improvement" when CE-6 was enacted, Appellants urge the court to focus instead on the 2014 Forest Service Manual ("FSM").  The 2014 Manual defines "Stand Improvement" as "[a]n intermediate treatment of trees *not past the sapling stage* made to improve the composition, structure, condition, health, and growth of even- or uneven-aged stands."  FSM § 2470.5 (emphasis added).

Appellants offer two theories for why the Forest Service must abide by the 2014 Manual definition.  First, when the Forest Service originally adopted CE-6 in 1992, it also adopted a revised policy and procedure that Appellants believe require the agency to use Forest Service Manual definitions.  Second, they argue that the Forest Service is bound by the 2014 Manual when carrying out activities within the Los Padres Forest (where Cuddy Valley is located) because its forest plan incorporated the Manual's definitions.  Each theory wilts under scrutiny.

First, Appellants point out that when the Forest Service adopted a revised policy and procedure for implementing NEPA and CEQ regulations in 1992, it included language that "[t]he procedures in the Handbook *must* be used in conjunction with other direction found throughout the Forest Service Manual and Handbooks."  NEPA; Revised Policy and Procedures, 57 Fed. Reg. 43,180, 43,188 (Sept. 18, 1992) (emphasis added).  Appellants thus argue that this language supports their position that procedures for carrying out NEPA, including CE-6, "must" follow Manual definitions.  So far, so good.

But the 1992 revision goes on further. And the full text directly undermines Appellants' position. The very next sentences of the 1992 revision clarify that only *particular parts* of the Manual and Handbooks must be used. "Specifically, use this Handbook in conjunction with FSM Chapter 1950 . . . . Also, integrate the requirements in this Handbook with the procedures set forth in FSM 1920 and FSH 1909.12." *Id.* Manual Chapters 1950 and 1920, and Handbook 1909.12 do not define "timber stand improvement." FSM §§ 1920, 1950; FSH § 1909.12. Silvicultural definitions (those related to trees, including "stand improvement") are found in Manual Chapter 2470.5. FSM § 2470.5. Appellants' quoted language thus incorporated only Forest Service Manual Chapter 1950 and 1920, which have nothing to do with "timber stand improvement." Indeed, in the same notice, the Forest Service separately incorporated a select few terms into the "definitions" section of the Handbook that addresses the Forest Service's NEPA obligations. 57 Fed. Reg. at 43,181. These definitions did not include a definition for "timber stand improvement." *See* 57 Fed. Reg. at 43,188–92.

Facing this snag, Appellants alternatively argue that the Los Padres Forest Plan explicitly incorporates the Manual. This court has held that "where an otherwise advisory document has been clearly incorporated into a Forest Plan or other binding document, its requirements become mandatory." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009). But the Los Padres Forest Plan makes at most a passing suggestion to "guidance" found in the "body of information" that comprises the Forest Service Manual and Handbook. Such vague language is not clear incorporation. As the district court held, Appellants "cite no authority for the proposition" that the Forest Service Manual definitions apply to the Forest Service's NEPA regulations,

"or even in support of the more general proposition that a mandate in a single NMFA-issued forest plan could bind the Forest Service's interpretation of its own separate NEPA regulations."  In sum, the 2014 Manual's definition of "stand improvement" does not bind the Forest Service.

### 3.   *Other CEs do not limit the scope of CE-6.*

Finally, Appellants argue that other categorical exceptions implicitly cabin CE-6's scope.  They argue that CE-12 and CE-14 are the appropriate categories for the harvest of commercial timber.  And unlike CE-6, those CEs are limited to 70 and 250 acres, respectively (the Cuddy Valley Project encompasses over 1,000 acres).[8]

But in selecting a CE for a project, the Forest Service only needs to cite and rely on one CE, even if other CEs may apply.  36 C.F.R. § 220.6(f)(2)(ii); *see Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1180–81 (E.D. Cal. 2018) ("CEs may overlap," and the fact that a project fits into one CE "does not mean that it could not also have fit into another one").  Additionally, the cited CEs do not adequately capture the objectives of the project—CE-10 does not touch upon insects, disease, or drought; CE-12's tiny acreage limitation does not accommodate fire hazard reduction; and CE-14 does not address fire hazard reduction.[9]

---

[8] CE-10 allowed for hazardous fuel reduction but this court enjoined it.  *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1026–30 (9th Cir. 2007).

[9] These differences between the CEs, along with the recognition that CEs may overlap, undercut the dissent's claim that our reading of CE-6 is inconsistent with the structure of regulation.  In short, the various CEs are not redundant merely because there is overlap.

## II. The Forest Service's Decision to Apply CE-6 to the Project Was Not Arbitrary and Capricious.

An agency's decision to invoke a categorical exclusion to avoid an EIS or EA is not arbitrary and capricious if "the agency reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion." *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1114 (E.D. Cal. 2017) (citing *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999)).

CE-6 permits "[t]hinning or brush control to improve growth or to reduce fire hazard" as long as these activities "do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6). Because the Cuddy Valley Project authorizes thinning to reduce "stand density, competing vegetation, and fuels" and will not require the use of herbicides or any road construction, the Forest Service reasonably determined that it falls within the scope of CE-6. The Forest Service's decision memorandum adequately explained that the project would combat fire, insect damage, and disease. Given the deferential standard of review, we cannot say that the Forest Service's decision to apply CE-6 was arbitrary and capricious.

Appellants still contend that invoking CE-6 was arbitrary and capricious because the Forest Service ignored NEPA's intensity factors when deciding that no extraordinary circumstances existed that would bar relying on CE-6. Even if a proposed project fits within a categorical exclusion, the Forest Service can forgo an EA or EIS only if "there are no extraordinary circumstances related to the proposed action." 36 C.F.R. § 220.6(a). An "extraordinary circumstance" is a circumstance "in which a normally excluded action may have a significant environmental effect." 40 C.F.R.

§ 1508.4.    The regulations provide many "resource conditions" that the Forest Service should analyze in determining whether there are "extraordinary circumstances."  36 C.F.R. § 220.6(b).

Here, the Forest Service analyzed each of these resource conditions and found that the project would have "no significant impact" on each.  But Appellants argue that the Forest Service was also required to analyze "intensity factors" set out in 40 C.F.R. § 1508.27(b).  These factors provide context for what makes an environmental effect "significant."   Appellants claim that the Forest Service should have explicitly analyzed the second and fourth factors, which are about effects on "public health or safety" and those that are "highly controversial," respectively. 40 C.F.R. § 1508.27.  The Forest Service concedes that it did not directly analyze the § 1508.27 intensity factors in approving the project.

The Forest Service, however, did not have to examine the intensity factors when analyzing whether extraordinary circumstances prevented the use of CE-6.  Because the scope of the resource conditions is expansive, the Forest Service must "necessarily take into account the NEPA-wide definition of '[s]ignificantly' provided in § 1508.27" when it analyzes those resource conditions.  *Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 411 (6th Cir. 2016).  To require an agency to analyze the extraordinary circumstances factors once (under resource conditions), and then again under merely renamed factors, would be "inconsistent with the efficiencies that the abbreviated categorical exclusion process provides."  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013).

In short, the Forest Service's decision to approve the project was not arbitrary and capricious because (1) it did

not have to consider the intensity factors listed at 40 C.F.R. § 1508.27, and (2) it adequately considered the resource conditions listed at 36 C.F.R. § 220.6(b).

III.    **The Forest Service Did Not Violate NFMA in Determining That the Project Tracks the Los Padres Forest Plan's Aesthetic Management Standards.**

NFMA provides for forest planning and management.  It requires agencies to develop a "Forest Plan" for each unit of the National Forest System.  16 U.S.C. § 1604(a); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003).  Actions approved by the Forest Service within a particular forest unit must follow the forest plan for that forest.  16 U.S.C. § 1604(i).  The Forest Service's failure to comply with a forest plan would violate NFMA.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

As part of the Land Management Plan for the Los Padres National Forest, the Forest Service promulgated certain "Plan Standards" as required by 36 C.F.R. § 219.   The standards at issue are the Aesthetic Management Standards S9 and S10, which require maintaining the forest at a level of "High Scenic Integrity," meaning that human activities are not visually evident.

Appellants bring two NFMA-related arguments, both of which fail.

The first argument is procedural: They maintain that the Forest Service did not follow the correct timeline in explaining how the project would meet the aesthetic management standards.   They contend that the Forest Service should have provided its explanation when it issued

the decision memorandum, and that the district court improperly allowed the Forest Service to submit an after-the-fact analysis in supplemental briefing.

We, however, recently held that NFMA and the APA do not require the Forest Service to "memorialize[] at the time the project is authorized" how the proposed project complies with the Forest Plan. *Or. Nat.,* 957 F.3d at 1034. Although NFMA regulations promulgated later require a document describing how proposed activities follow the forest plan, 36 C.F.R. § 219.15(d), such regulations do not apply to plans that predate their enactment. *Or. Nat.* 957 F.3d at 1034 & n.12. The Los Padres Forest Plan predates those recent regulations. The Forest Service thus did not have to issue explanatory documentation when the project was authorized.

Moreover, the Forest Service's articulated rationale was not a mere post hoc rationalization. The district court permitted the Forest Service to more fully explain its rationale in supplemental briefing. This was not error. *See Midwater Trawlers Coop. v. Dep't of Com.*, 393 F.3d 994, 1007–08 (9th Cir. 2004) (upholding the district court's decision to permit the National Fisheries Service to supplement the record "so that it could determine whether the Fisheries Service provided sufficient explanation" for its adoption of a type of methodology for allocating fish).[10]

---

[10] Judicial review of an "agency decision may 'be expanded beyond the [administrative] record if necessary to explain agency decisions.'" *Midwater Trawlers*, 393 F.3d at 1007 (quoting *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450). "Supplementation is permitted '(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is

Appellants also offer a more substantive argument: The Forest Service's approval of the Cuddy Valley Project was arbitrary and capricious because the project does not meet the aesthetic management standards in the Forest Plan.  But the Forest Service's conclusion that the project meets the Scenic Integrity Standards in the Forest Plan was not arbitrary and capricious.  *Forest Guardians*, 329 F.3d at 1098 (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998)).  Even when an agency explains its decision with "less than ideal clarity," a court will uphold the agency's decision "if the agency's path may reasonably be discerned."  *Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Because the Cuddy Valley Project authorizes no road construction and preserves larger trees, the Forest Service concluded that it will either retain a High Scenic Integrity Level or at most result in a drop of only one level, which is permitted with the Forest Supervisor's approval.  The Forest Service pointed to Agricultural Handbooks 559 and 701, which reveal that thinning treatments, including commercial thinning, can be implemented while still maintaining a high scenic integrity standard.  The treatments proposed in the project are meant to reduce the chance of unplanned wildfire, which the Forest Service identified as a threat to scenic integrity.  The Los Padres Forest Plan itself emphasizes "[a]ctive management of vegetation" including "vegetative treatments that reduce stand densification problems" to maintain "[t]he big tree (old growth) appearance of the Jeffrey pine forests."  Because the Forest Service did not act arbitrarily and capriciously in concluding that the project

---

necessary to explain technical terms or complex subject matter.'"  *Id.* (quoting *Sw. Ctr.*, 100 F.3d at 1450).

tracks the Forest Plan Scenic Integrity Objectives, its decision to approve it does not violate NFMA.

## CONCLUSION

The Forest Service cannot rely on CE-6 without limit. Timber stand improvement activities under CE-6 must still improve the composition, constitution, condition, or growth of the tree stand. Projects are also limited in size by CE-6's requirement that no more than one mile of low standard road may be constructed to carry out the project. But CE-6's plain language does not bar the Forest Service from commercial thinning of trees to reduce fire risk. We **AFFIRM** the district court's grant of summary judgment.

STEIN, District Judge, dissenting:

In this case, the Forest Service has authorized commercial thinning on 601 acres of Los Padres National Forest without studying—much less disclosing—any adverse environmental implications through an environmental impact statement ("EIS") or even a bare-bones environmental assessment ("EA"). The Forest Service may bypass issuing an EIS or EA for a proposed action only if (i) the "agency determines that a categorical exclusion" ("CE")—a "category[] of actions that normally do not have a significant effect on the human environment"—"covers the proposed action"; and (ii) in cases where the mandatory evaluation for "extraordinary circumstances" reveals that an action "may have a significant effect," "the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects." 40 C.F.R. § 1501.4.

Here, the Forest Service relies on a novel interpretation of its long-standing CE-6 to facilitate its 1,200-acre Cuddy Valley Project (the "Project"). Such an interpretation would allow the Forest Service to approve commercial thinning of trees—in other words, to contract with private logging companies to cut and then sell large trees—over a potentially unlimited number of acres.

The majority—in affirming the district court's grant of summary judgment for the Forest Service—does not employ *Auer* deference to uphold the Forest Service's conclusion; it instead concludes that the Forest Service's interpretation is correct based on the plain text of CE-6. In so doing, however, the majority ignores the Supreme Court's explicit instructions in *Kisor v. Wilkie* that, in determining whether "a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction[,]" including not only the text, but also the "structure, history, and purpose" of the regulation. 139 S. Ct. at 2415–16 (2019) (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). Because I find, employing all the traditional tools of statutory construction, that the CE-6 exemption unambiguously prohibits the Forest Service from performing commercial thinning of trees pursuant to CE-6, I respectfully disagree with Part I.B of the majority's analysis and would reverse the district court's denial of Appellants' motion for summary judgment.

*****

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir. 2015). For such interpretation, "[o]ur 'legal toolkit' includes careful examination of 'the text, structure, history, and purpose of a regulation.'" *Amazon.com, Inc. v.*

*Comm'r of Internal Revenue*, 934 F.3d 976, 984 (9th Cir. 2019) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415).

The majority correctly references the United States Supreme Court's directive in *Kisor v. Wilkie* that in interpreting regulations, "a court must exhaust all the 'traditional tools' of construction." 139 S. Ct. at 2415 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  But while the majority concedes the need to "exhaust" the "traditional tools of construction," it considers solely the first of *Kisor*'s "traditional tools"—the *text*—and fails to consider, much less exhaust, the remaining three: the  "structure, history, and purpose of a regulation." 139 S. Ct. at 2415.

The majority defends their cursory analysis on the basis that "when the 'words of a [regulation] are unambiguous, then, this first canon [of relying on the text of the statute or regulation] is also the last: judicial inquiry is complete.'" Majority Opinion Analysis I.B.1 (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 16 (1992)).  But in *Robinson v. Shell Oil Co.*, the Supreme Court issued clear instructions that a court's inquiry cannot cease upon a finding that some phrase read in isolation is unambiguous: "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  Our inquiry must cease if the statutory language is unambiguous *and* 'the statutory scheme is coherent and consistent.'" 519 U.S. 337, 340 (1997) (citing *United States v. Ron Pair Enters.,* 489 U.S. 235, 240 (1989)) (emphasis added).  *See also Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 412 (2011) (same); *Sebelius v. Cloer*, 569 U.S. 369, 380 (2013) (same).

As explained below, the "text, structure, history, and purpose" of the Forest Service's CE-6 demonstrate that this

categorical exclusion cannot extend to commercial thinning. *See Kisor*, 139 S. Ct. at 2415 (emphasis added). Each roman numeral explicates a separate *Kisor* tool.

## I.   Textual Analysis of Categorical Exception 6

The majority's textual analysis makes brief reference to five sources—(i) the text of the regulation itself, (ii) the Oxford English Dictionary, (iii) Webster's Third New International Dictionary, (iv) the 1990 Forest Service Manual, which was operative at the time CE-6 was adopted, and (v) a Society of American Foresters' 1971 publication— to conclude that CE-6 unambiguously permits commercial thinning.

### A. Textual   Analysis   of   CE-6   Example   with "Thinning"

The majority contends that CE-6's term "thinning" (used as an example of a timber stand improvement activity) should be construed in its general and ordinary sense because the regulation, as written, does not limit forest activities based on tree age or size. But "thinning" as used in the forestry context is not a term used in common parlance; "thinning" is just one word of CE-6's second example, which in turn is just one of four examples. In addition, CE-6 is but one of 22 categorical exclusions under 36 C.F.R. § 220.6(e) for actions requiring "a project or case file and decision memo" that permit the Forest Service to undertake a major action without completing an EIS or an EA. *See* 36 C.F.R. § 220.6(e). *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a

view to their place in the overall statutory scheme.'") (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

The majority's effort to short circuit a textual analysis of "thinning" finds no basis in Ninth Circuit law. The majority references *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 990 (9th Cir. 2020), for the proposition that the Ninth Circuit has "construed common words (such as 'thinning') according to the normal and ordinary meaning," Majority Opinion Analysis I.B.1, but *Carlson* offers not even remote support. First, *Carlson* makes no reference to "thinning." Second, *Carlson* provides no discussion of how courts should determine "common words" and no indication that "thinning" for improving growth or reducing fire hazard is a "common word" similar to the "repair and maintenance" of roads and trails. *Compare* 36 C.F.R. § 220.6(e)(6), *with* 36 C.F.R. § 220.6(d)(4).

Last, *Carlson*'s statement that for 36 C.F.R. § 220.6(d)(4), "'repair' and 'maintenance' are common words with well-understood ordinary meanings" is grounded in that CE's use of examples to illustrate types of repair and maintenance work under the CE: "In order to ensure that these words are understood in accordance with their ordinary meanings rather than as terms of art, the CE provides examples. 'Repair and maintenance' of roads include 'grad[ing], resurfac[ing], and clean[ing] the culverts' of a road; 'grading a road' . . . ." *Id.* (citing 36 C.F.R. § 220.6(d)(4)). In *Carlson*, "repair" and "maintenance" in 36 C.F.R. § 220.6(d)(4) appear in the main clause of the exclusion and are followed by a tabulated list of examples "[i]n order to ensure that these words are understood in accordance with their ordinary meanings rather than as terms of art." 968 F.3d at 990. Here, CE-6's "thinning . . . to

improve growth or to reduce fire hazard" is just one of four examples designed to illustrate the scope of the categorical exclusion for "[t]imber stand and/or wildlife habitat improvement activities . . . ." 36 C.F.R. § 220.6(e)(6).

Thus, because "thinning" in CE-6 is not an ordinary word but rather a term of art, the majority's heavy reliance on the Oxford English Dictionary and Webster's Dictionary to explain the meaning of "thinning" is inapposite. *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context").[1]

---

[1] Moreover, the majority's references to dictionary definitions reveal distinct definitions of "thin." The Oxford English Dictionary definition of thin as to "render less crowded or close by removing individuals; hence, to reduce in number" is merely descriptive of the action, with no required purpose. Majority Opinion Analysis I.B.1 (citing *Thin, Oxford English Dictionary* 941 (2d ed. 1991). By contrast, the Webster's definition of thin is "to remove surplus plants or trees . . . so as to improve the growth of the rest." Majority Opinion Analysis I.B.1 (citing *Webster's Third New Int'l Dictionary* 11 2376 (1993)). The Webster's definition entails a discrete goal or purpose of the removal: improving growth of the remaining trees.

The Webster's definition of "thin" is thus seemingly incompatible with CE-6's second example: "Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand." 36 C.F.R. § 220.6(e)(6). In the example, available actions are "thinning or brush control" and the permissible objectives are "to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand." *Id.* If thinning necessarily entailed actions to "improve growth the growth of the rest" then thinning could not facilitate the sole illustration in CE-6's second example: "to reduce fire hazard *including the opening of an existing road to a dense timber stand.*" 36 C.F.R. § 220.6(e)(6)(ii) (emphasis added).

In sum, because CE-6's term "thinning" (as an example of a timber stand improvement activity) is ambiguous without reference to the context in which it was written, the majority errs in relying on dictionary definitions and neglecting to thoroughly address what a timber stand improvement activity may reasonably mean when such activity is one of the 36 C.F.R. § 220.6(e) 22 categorical exclusions.

## B. Textual Analysis of "Timber Stand Improvement"

The majority makes only a partial attempt to arrive at the meaning of the critical term "timber stand improvement." It looks to the 1990 Forest Service Manual ("1990 FSM") that was operative when CE-6 was adopted in 1992. But it performs a truncated analysis of that document. The majority relies on the statement in the 1990 FSM that the Society of American Foresters' 1971 publication "Terminology of Forest Science, Technology, Practices, and Products" is "the recognized basis for silvicultural [tree] terminology and definitions," and immediately turns to the 1971 publication to conclude that a timber stand improvement is "[a] loose term comprising all intermediate cuttings . . . ." SOCIETY OF AMERICAN FORESTERS, TERMINOLOGY OF FOREST SCIENCE, TECHNOLOGY, PRACTICES, AND PRODUCTS 277 (F.C. Ford-Robertson ed., 1971).

Confusingly, however, the majority neglects to consider whether the 1990 FSM *itself* offers a definition of timber stand improvements. I readily concede that the FSM "does not have the force of law," *Forest Guardians v. Animal & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002); yet find that the 1990 FSM offers most helpful guidance as to the meaning of CE-6's "timber stand

improvement" as the public understood the term at the time CE-6 proceeded through notice and comment.

That manual contains a section outlining "Kinds of Timber Stand Improvement" that expressly limits the universe of timber stand improvements categories for Forest Service "work planning and reporting." FSM § 2476.3 (1990). The manual states that only "[t]he following are the categories of [Timber Stand Improvements] recognized for work planning and reporting: 1. Release and weeding. 2. Precommercial thinning. 3. Pruning. 4. Control of understory vegetation. 5. Fertilization. 6. Animal damage control." *Id.* In that section, only "precommercial thinning," not "commercial thinning," is recognized as a timber stand improvement activity. *Id.* Thus, the textual analysis shows that "commercial thinning" is not a permitted type of timber stand improvement under the 1990 FSM and as the public understood the term when CE-6 proceeded through notice and comment.

Although the majority concedes that "[t]he phrase 'timber stand improvement' is a term of art, so we cannot depend only on dictionaries to discern its meaning," Majority Opinion Analysis I.B.1, the majority fails to "examine 'contemporaneous sources to determine the legal meaning of the term' at the time the regulation was adopted." *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017). Rather than undertake its own analysis to consider whether the 1990 FSM offers helpful guidance as to the meaning of CE-6's "timber stand improvement" at the time CE-6 was adopted, the majority only references the 1990 FSM's substantive language to discredit the notion that the 1990 FSM might offer even remotely helpful insight to a court determining the meaning of the critical term. As explained below, the majority's critiques are unpersuasive.

First, the majority argues that "there is no indication that the list of examples was intended as exclusive or exhaustive, or that this example for 'work planning and reporting' was intended to define 'timber stand improvement' generally." Majority Opinion Analysis I.B.1.  In so arguing, the majority ignores the fact that (i) the 1990 FSM nowhere else expounds upon the meaning of timber stand improvements; (ii) the "work planning and reporting" text that "[t]he following are *the* categories of TSI recognized for work planning and reporting," FSM § 2476.3 (1990) (emphasis added) precedes a logically exhaustive tabulated list due to the use of "the"; and (iii) the 1990 FSM frequently employs terminology to connote non-exhaustive lists, using "such as" for non-exhaustive lists eight times. 1990 FSM.

Further, even if the 1990 FSM's meaning of timber stand improvements for Forest Service "work planning and reporting" is narrower than a "general" dictionary definition of "timber stand improvement," courts must nevertheless consider the 1990 FSM definition when deriving the meaning of CE-6.  On the one hand, a timber stand improvement definition limited to Forest Service "work planning and reporting" appears highly relevant to the agency's use of CE-6 because CE-6 requires "a project or case file and decision memo." 36 C.F.R. § 220.6(e).  On the other hand, courts need not only rely on some general definition here because, as the majority notes, "'[t]he phrase "timber stand improvement' is a term of art, so we cannot depend only on dictionaries to discern its meaning." Majority Opinion Analysis I.B.1.

Second, the majority argues that the "the 1990 Forest Service Manual elsewhere undercuts the dissent's proposed reading because it authorizes the Forest Service to '[a]ccomplish timber stand improvement objectives to the

extent possible by *commercial sale . . . of timber* and other forest products.'"  Majority Opinion Analysis I.B.1 (citing FSM § 2476.03 (1990)). Here, the majority neglects to recognize that "commercial sale" is a means to effectuate the "timber stand improvement objectives" defined elsewhere at FSM § 2476.3 (1990); this "commercial sale" is the policy of how the Forest Service can remove "timber and other forest products." The 1990 FSM's use of "commercial sale" does not somehow authorize "commercial thinning."

Last, the majority makes a nearly identical argument over a reference to a "timber sale." Majority Opinion Analysis I.B.1 ("[The FSM] further notes that the agency can seek timber stand improvement 'by Timber Sale'—i.e., to '[h]andle as a timber sale, *any material* to be cut or killed in a stand improvement project that *can be sold as stumpage* or other product.'") (citing FSM § 2476.51 (1990)).  As with the "commercial sale" analysis above, the 1990 FSM's text merely authorizes a "timber sale" for the byproduct of a timber stand improvement project. FSM § 2476.51 (1990). The majority cannot reasonably read the phrase "any material" in FSM § 2476.51 to somehow expand the scope of what the 1990 FSM contemplates when it defined applicable timber stand improvement activities for Forest Service work planning and reporting purposes.    FSM § 2476.3 (1990).

As explained below, the majority's failure to analyze a major cotemporaneous source—the 1990 FSM—is merely one example of how the majority has failed to "exhaust all the 'traditional tools' of construction," including "[t]he text, structure, history, and purpose" of the regulation.  *Kisor*, 139 S. Ct. at 2415 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  Adhering to the Supreme Court's instructions in *Kisor*, I analyze the

structure, history, and purpose of CE-6 and conclude that the term "thinning" in CE-6 unambiguously does *not* permit commercial thinning.

## II. The History of 36 C.F.R. § 220.6 shows that "Thinning" Does Not Encompass "Commercial Thinning"

In 1991, when the Forest Service first proposed CE-6, it stated that the previously existing CE, a broad "category of low impact silvicultural activities," would be separated into "precise, clearly understood categories of proposed actions." 56 Fed. Reg. 19,720–21 (Apr. 29, 1991).  The initial versions of these new categories were:

> (1) Proposals to harvest or salvage timber which remove one million board feet or less of merchantable wood products; require one mile or less of new road construction; assure regeneration of harvested or salvaged areas, where required;

> (2) Proposals to thin merchantable timber from over-stocked stands which require one mile or less of new road construction;

> (3) Proposals to artificially regenerate areas to native tree species, including needed site preparation not involving the use of pesticides; and

> (4) Proposals to improve vegetation or timber conditions using approved silvicultural or habitat management

techniques, not including the use of herbicides.

56 Fed. Reg. 19,721.  In the final language of the rule, the fourth category, which became CE-6, remained separate from the second category, "[p]roposals to thin merchantable timber from over-stocked stands," which became CE-4. National Environmental Policy Act; Revised Policy and Procedures, 57 FR 43,209 (Sept. 18, 1992) (now codified at 36 C.F.R. § 220.6(e) pursuant to National Environmental Policy Act Procedures, 73 Fed. Reg. 43,084, 43,091 (July 24, 2008)).  The fact that CE-6 and CE-4 were separate and distinct (before a court issued a nationwide injunction against CE-4[2]) makes clear that the Forest Service did not consider "thinning of merchantable timber" to be a vegetation or timber stand improvement technique.

The Forest Service's own 1990 Manual lends further support to this proposition. "When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Medina Tovar v. Zuchowski*, 982 F.3d 631, 636 (9th Cir. 2020) (quoting *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019)).  Because none of the categories of timber stand improvement listed in the 1990 FSM contemplate or are of the same general scope and character as commercial thinning of trees, the 1990 FSM supports appellant's interpretation that the meaning of CE-

---

[2] *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 980 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000) ("Because the Court finds the timber harvest CE unlawful under NEPA, the Court may not enjoin its application in just a narrow, geographic area. The FS intended the challenged CE to be applied nationwide on all FS lands, so in finding the CE unlawful, the Court sees no option but to enjoin its application nationwide.").

6's "timber stand improvement activity" does not encompass commercial thinning.

When the Forest Service adopted the final language of CE-6 (along with eight other CEs) in September 1992, the 1990 FSM established categories of timber stand improvement activities: release and weeding, precommercial thinning, pruning, control of understory vegetation, fertilization, and animal damage control. FSM § 2476.3 (1990). None of these categories could allow for commercial thinning: First, weeding, pruning, control of understory vegetation, fertilization, and animal damage control are activities that are limited in scope and plainly do not contemplate logging of large trees. Second, by listing "precommercial thinning" as a standalone timber stand improvement category rather than "commercial thinning" or the broader "thinning," the Forest Service specifically foreclosed the notion that a "timber stand improvement" could encompass commercial thinning. Finally, "release treatment," as defined by the 1990 manual, is "an intermediate treatment or cutting designed to free a young stand of desirable trees, *not past the sapling stage*, from the competition of undesirable trees that threaten to suppress them." FSM § 2470.5 (1990) (emphasis added). Because trees "not past the sapling stage" are not commercially saleable, "release," too, is not of the same scope or character as commercial thinning.

The current version of the Forest Service Manual, updated in 2014, provides further clarity. It defines a "stand improvement" (previously referred to as a timber stand improvement) as "[a]n intermediate treatment of trees *not past the sapling stage* made to improve the composition, structure, condition, health, and growth of even or uneven aged stands." FSM § 2470.5 (2014). As in the 1990 version

of the Forest Service Manual, the 2014 version provides that only "the following are the categories of stand improvement recognized for work planning and reporting:" release and weeding, precommercial thinning, pruning, fertilization, control of understory vegetation, and animal damage control.  FSM § 2476.3.  The fact that the Forest Service's definition of a stand improvement lists the same stand improvement categories in the 2014 Manual as it does in the 1990 Manual offers strong evidence that (i) the Forest Service's definition of a timber stand improvement activity has not changed since CE-6 was promulgated in 1992 and (ii) that this long-standing definition of a timber stand improvement activity cannot extend to commercial thinning.

III.    **The Structure of 36 C.F.R. § 220.6 Shows That "Thinning" Does Not Encompass "Commercial Thinning"**

Nor does the "entire regulatory scheme as a whole" support the idea that CE-6's "thinning" could extend to commercial thinning. *See Amazon.com, Inc. v. Comm'r of Internal Revenue*, 934 F.3d 976, 986 (9th Cir. 2019) (internal quotation marks omitted) (citation omitted).  For instance, the text of a different CE in the same regulation, CE-12, explicitly indicates that permissible timber harvest activities include "commercial thinning of overstocked stands." 36 C.F.R. § 220.6(e)(12).  If, as the majority concludes, "thinning" as used throughout the regulation includes commercial thinning, the Forest Service would have no need to indicate explicitly that CE-12 permits commercial thinning. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (stating the "normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning").

Further, under the majority's interpretation, CE-12, along with CE-14, become redundant. The Forest Service states that the Project encompassing approximately 1,200 acres of "overstocked" natural stands furthers two objectives: (i) "reduce the risk of insect and disease infestation" and (ii) "to make the stands more resilient to wildfire." These goals are also consistent with CE-12, which permits "[c]ommercial thinning of overstocked stands to . . . increase health and vigor," 36 C.F.R. § 220.6(e)(12), and CE-14, which contemplates "[c]ommerical and non-commercial sanitation harvest of trees to control insects or disease." 36 C.F.R. § 220.6(e)(14). These two CEs—which explicitly contemplate commercial timber harvest—both contain acreage limitations: 70 acres for CE-12 and 250 for CE-14. In other words, the Forest Service could only bypass the standard environmental review procedure if a proposed project's geographic footprint is 70 acres (under CE-12) or 250 acres (under CE-14) or smaller. This Project contemplates mechanical thinning of trees of up to 601 acres, which is more than double the maximum acreage permitted for harvesting under either CE-12 or CE-14.

Because, as the majority correctly notes, the Forest Service need only rely on one CE to circumvent NEPA's requirement to prepare an EA or the more extensive EIS, *see* 36 C.F.R. § 220.6(f)(2)(ii), allowing the Forest Service to use CE-6 (containing *no* acreage limitation) to perform commercial harvest activities relating to improving forest health or reducing risk of insect infestation functionally render the acreage limitations of CE-12 and CE-14 a dead letter. Thus, the majority's interpretation "would violate 'one of the most basic interpretive canons, that a statute [or *regulation*] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *United States v.*

*Grandberry*, 730 F.3d 968, 981–82 (9th Cir. 2013) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)) (emphasis added).

## IV.    The Overall Policy Concerns Animating CE-6 Do Not Support a Definition of "Timber Stand Improvement" That Includes Commercial Thinning

Lastly, the overarching object and policy of CE-6 demonstrate that CE-6 does not allow for commercial thinning. *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (internal citations omitted).    Here, "[i]n determining a statutory provision's meaning, we may consider the purpose of the statute in its entirety, and whether the proposed interpretation would frustrate or advance that purpose." *DaVita Inc. v. Virginia Mason Mem'l Hosp.*, 981 F.3d 679, 692–93 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001)).    An interpretation of CE-6 "which would produce absurd results [should] be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (citations omitted).    And as this Circuit observes, "[t]he rationale for a CE is that a project that will have only a minimal impact on the environment should be allowed to proceed without an EIS or and EA." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 990 (9th Cir. 2020).

NEPA, enacted in 1970, "declares a broad national commitment to protecting and promoting environmental quality." 42 U.S.C. § 4321 *et seq.*; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing

83 Stat. 852, 42 U.S.C. § 4331).  NEPA requires federal agencies to prepare an EIS for proposed "[f]ederal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Pursuant to the regulations implementing NEPA, "[a]n agency *shall* prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement." 40 C.F.R. § 1501.5(a) (emphasis added); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (noting that "[a] threshold question in a NEPA case is whether a proposed project will 'significantly affect' the environment, thereby triggering the requirement for an EIS.  As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS").

This statutory requirement ensures that federal agencies thoroughly consider "detailed information concerning significant environmental impacts" before approving certain actions and make this information "available to [a] larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

By relying on a CE, an agency may avoid preparing either an EA or an EIS altogether but only where the action would not "have a significant effect on the human environment," 40 C.F.R. § 1501.4.  The Forest Service's, and the majority's, interpretation of CE-6 is thus inconsistent with NEPA because it would allow the Forest Service to circumvent NEPA's requirements to prepare an EA or an

EIS by using CE-6 to approve projects that would manifestly have a significant effect on the environment: because CE-6 contains no acreage limitation, the Forest Service—with the majority's stamp of judicial approval—can now authorize projects involving commercial logging over an unlimited number of acres without preparing an EA or EIS.  Although the Project in this case will involve approximately 600 acres of commercial logging, the majority's interpretation allows the Forest Service to commercially log trees without first preparing an EA or an EIS over many more acres than that— whether that be 1,000, 6,000, or even many more acres. Commercial logging projects of this scope would certainly have a significant effect on the environment in contravention of 40 C.F.R. § 1507.3(e)(2)(ii).

Both the majority and the Forest Service fail to identify any limiting factor that could plausibly avoid this result. First, CE-6's dictate that the Project must be tied to a "timber stand improvement" activity (or a wildlife habitat improvement activity) cannot act as a sufficient bulwark against environmental harm caused by a significant amount of commercial thinning.  Other parts of regulation 36 C.F.R. § 220.6 at issue confirm that even a Forest Service action that is intended to improve, rather than harm, a project is not exempt from acreage limitations: such acreage limits are designed to ensure that a categorically exempted project's impact does not have a "significant effect on the human environment."  For instance, even where the purpose of a timber sale permitted by CE-12 and CE-14 is to "control insects or disease" or to "achieve the desired stocking level to increase health and vigor," the acreage limits on timber harvest still apply.  *See* 36 C.F.R. § 220.6 (e)(12), (14).

Both of CE-6's explicit limitations—on herbicide use and on low standard road construction of more than one

mile—are false also saviors.  In 1999, a district court struck down CE-4 that authorized "[t]imber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products," as arbitrary and capricious. *See Heartwood*, 73 F. Supp. 2d at 975.  CE-4, like CE-6 (adopted at the same time as CE-4), also included the limitation that the proposed activity to be excluded could "not require more than one mile of low standard road construction."  57 Fed. Reg. at 43,209.  Even with this limitation, the court found that in promulgating CE-4, the Forest Service "failed to adequately address or provide support for its position that the timber harvests of these magnitudes would not have cumulative effects on the environment" and enjoined further actions using the timber harvest CE.  *Heartwood*, 73 F. Supp. 2d. at 976, 980.  And as a matter of common sense, prohibiting the use of herbicides does very little to mitigate the significant harm to the environment caused by large-scale commercial logging.

Because the Forest Service's interpretation of CE-6—that commercial thinning over a potentially unlimited number of acres is a "timber stand improvement activity" that "do[es] not have a significant effect on the human environment." 40 C.F.R. § 1507.3(e)(2)(ii)—contravenes the very purpose of NEPA, the majority errs in concluding that CE-6 unambiguously permits this result.  Rather, a purpose analysis demonstrates that CE-6 cannot encompass commercial thinning.

*****

Taking direction from *Kisor* and settled Ninth Circuit law, I have attempted to explicate "the text, structure, history, and purpose of a regulation." *Kisor*, 139 S. Ct. at 2415.  In so doing, I conclude that CE-6 cannot support

the Forest Service's decision to approve the 1,200-acre Cuddy Valley Project when it has conducted neither an environmental impact statement review nor a bare-bones environmental assessment review.

NEPA's requirements do not constitute merely a "time-consuming regulatory hurdle," as the majority, tellingly, writes. Those requirements are the law, duly enacted and promulgated to ensure that federal agencies "carefully consider [] detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). By failing to consider the consequences of allowing the Forest Service to evade NEPA's environmental disclosure requirements for projects involving significant amounts of commercial thinning—projects that are outside the scope of activities CEs are meant to authorize—the majority misses the forest for the trees and does an impermissible disservice to NEPA's regulatory scheme and the law.

I respectfully dissent.